# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF INDIANA
### SOUTH BEND DIVISION

| | | |
|---|---|---|
| WILLIAM SMITH AND | ) | |
| LUBIRTA SMITH | ) | |
| | ) | |
| PlaintiffS, | ) | |
| | ) | |
| vs. | ) | CAUSE NO. 3:09-CV-330 |
| | ) | |
| HOUSING AUTHORITY OF | ) | |
| SOUTH BEND, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

This matter is before the Court on the Defendant's Motion to
Dismiss First Amended Complaint, filed by the Defendant, the
Housing Authority of South Bend, on December 16, 2010. (DE #43.)
For the reasons set forth below, the motion is **GRANTED IN PART AND
DENIED IN PART**. As is described more fully in the body of the
order, the motion is **GRANTED** to the extent that the Defendant seeks
to dismiss the Plaintiffs' Bullying, Discriminatory Segregation,
Race Based Fair Housing Act, Federal Constitutional, State Due
Course of Law, and Title VI claims. These claims are **DISMISSED
WITH PREJUDICE**. However, the motion is **DENIED** to the extent that
the Defendant seeks to dismiss the Plaintiffs' Disability Based
Fair Housing, Rehabilitation Act, Americans with Disabilities Act,

Habitability, and Third Party Beneficiary claims. These claims **REMAIN PENDING** before the Court.


BACKGROUND

On July 23, 2009, the Plaintiffs, William Smith and Lubirta Smith (collectively, the "Smiths"), filed their Verified Complaint With Jury Demand. (Comp.) The original Complaint named numerous defendants including: (1) the Housing Authority of South Bend (the "HASB"); (2) Marva J. Leonard-Dent, the Executive Director of the HASB; (3) the Board of Commissioners of the HASB; (4) the individual members of the Board of Commissioners of the HASB (Susie Harvey-Tate, Earl L. Hairston, Rafael Morton, Robert B. Toothaker, and Gladys Muhammad); (5) Stephen J. Luecke, the Mayor of the City of South Bend; and (6) Shaun Donovan, the Secretary of United States Department of Housing and Urban Development ("HUD"). (Comp. ¶¶ 4-9.) Motions to dismiss were filed by the various defendants, and on September 30, 2010, this Court issued an order granting those motions. (DE #37.) While the claims against the Board of Commissioners, Marva J. Leonard-Dent, Susie Harvey-Tate, Earl L. Hairston, Rafael Morton, Robert B. Toothaker, and Gladys Muhammad were dismissed with prejudice, the remaining claims against the other named defendants were dismissed without prejudice. (*Id.* at 2.) The Court granted the Smiths leave to file a motion to amend their Complaint and a proposed amended pleading to clarify their

cause of action. (*Id.* at 30.) On November 15, 2010, the Smiths timely filed an Amended Complaint, naming only the HASB as a defendant. (Amended Comp. ¶ 4.) In lieu of an answer, the HASB filed the instant motion to dismiss. (DE #43.) The Smiths filed a response brief in opposition to the motion to dismiss on February 1, 2011. (DE #50.) The HASB filed a reply on February 11, 2011. (DE #51.) The motion is now ripe for adjudication.

The Amended Complaint describes the Smiths as married, African American adults, who reside as tenants at 628 Western Avenue, South Bend, IN 46601 (the "Property"). (Amended Comp. ¶ 3.) The Property is owned by the HASB. (*Id.*) The Amended Complaint further describes William Smith as "an individual with a disability or handicap in that he has significant limitations to major life activities, has a record of such limitations, and was perceived by Defendant HASB to have such limitations." (*Id.*) William Smith's disability is described as follows:

> Mr. Smith has mobility and strength limitations which impair his abilities to walk and to lift. He has undergone vascular surgery which has left him with severe limitations to his endurance, together with his abilities to walk and to lift. He has also suffered anxiety resulting from his physical disabilities; this anxiety and related stress and depression have caused limitations to his mental health which result in further limitations to his major life activities.

(*Id.*) The Smiths informed the HASB of William Smith's disabilities. (*Id.*)

The Smiths allege that the apartment[s] in which they live[d] and the Property as a whole fails, and has failed, to meet the standards of habitability and peaceable enjoyment, and that the HASB staff members have failed to remedy the problems of which the Smiths complained. (Amended Comp. ¶¶ 6-11.) Some of the specific issues include[d] a broken and flooding toilet that took three weeks to repair, a roach infestation, an air conditioner that did not work due to an old filter, non-functioning elevators for "several weeks at a time," a "filthy carpet," mold problems, a water main break and stoppage in the building disposal system that resulted in "three weeks of sickening odors," open electrical light sockets with exposed wires, and "dirty" common areas. (*Id.*)

Because of those complaints as well as Smiths' advocacy on behalf of other residents in the Property with similar complaints, the Smiths claim that the HASB staff members retaliated against them by failing to take remedial action. (*Id.* at ¶¶ 12 & 15.) The Smiths point out that some of these acts took place before they were married and prior to William Smith residing with Lubirta Smith in her apartment in the Property. (*Id.* at ¶ 13.)[1] The Smiths also allege that, prior to their marriage, the HASB "took actions to evict" William Smith from his previous apartment while he was "seriously ill" and commenced legal proceedings against him when

---

[1] Prior to the marriage, William Smith resided in a separate apartment in the Property.

the HASB knew he was "hospitalized for serious surgery." (*Id.* at ¶¶ 13-14.) The Smiths claim that these actions occurred in retaliation for William Smith's repeated complaints about the conditions and services at the Property. (*Id.* at ¶ 13.) It is the contention of the Smiths that Lubirta Smith was retaliated against "because of her association with Mr. William Smith" and because of her advocacy on his behalf both before and after their marriage. (*Id.* at ¶ 15.) They assert that this retaliation was taken in "the form of refusal to provide service and rude remarks to her." (*Id.*)

The Smiths also allege that the HASB staff members "acquiesced in the bullying of Mr. Smith by at least one other resident and did nothing to intervene and stop the bullying." (*Id.* at ¶ 16.)

Finally, the Smiths allege that the Property, the HASB complex in which the Property is located, and the neighborhood in general are all "populated overwhelmingly by residents who are African American and not Caucasian," many of whom are individuals with disabilities, and that the "concentration of non-Caucasion residents" is "far out of proportion to the corresponding population figures for the City of South Bend or the County of St. Joseph, IN." (*Id.* at ¶¶ 17-19.)

The Amended Complaint, which premises subject-matter jurisdiction on 28 U.S.C. § 1331 and 28 U.S.C. § 1367, alleges eight claims seeking vindication of rights "guaranteed to [the Smiths], as residents of a federally funded public housing project,

by the Fair Housing Act, as amended, 42 U.S.C. sec. 3601 et seq.;
the Civil Rights Act of 1964, 42 U.S.C. sec. 601 et seq.; Title II
of the Americans with Disabilities Act, 42 U.S.C. secs. 12131 et.
Seq.; the Rehabilitation Act of 1973, as amended, 29 U.S.C. sec.
794; and the Fourteenth Amendment to the Constitution of the United
States.[2]" (Amended Comp. ¶¶ 1-2.) For each claim, the Smiths seek
compensatory and exemplary damages, and the Amended Complaint also
requests equitable relief in various forms. (*Id.* at ¶¶ 30-31.)


DISCUSSION

As an initial matter, the Court notes that the precise claims
of the Smiths are difficult to decipher from the face of the
Amended Complaint. The Smiths present a narrative of Facts in
their Amended Complaint followed by a "Causes of Action" section
containing eight numbered claims referencing various statutes and
legal provisions. The Facts are applied generally to some of
specific numbered claims but not to others. These claims are
followed by an all-encompassing "Elements of Damages" clause
alleging that the Smiths have:

> suffered and are threatened with economic
> loss; loss of quiet enjoyment of their
> property; apprehension; fear; worry;
> humiliation; and physical and mental impact as
> a consequence of the actions of all
> Defendants. Each element of damages occurred

---

[2] The Smiths have also invoked supplemental jurisdiction to plead
claims under Indiana law.

> in each Cause of Action, and on each element
> of damages for each Cause of Action, [the
> Smiths] seek compensation in the amount of
> $10,000 compensatory and $10,000 exemplary
> damages for wanton and outrageous conduct.

(Amended Comp. ¶ 30.) The Court is left with the task of attempting to determine which Facts are meant to be applied to which claims, and the Smiths do little to clarify these issues in their response brief.

Federal Rule of Civil Procedure 8(a) provides, in part: "A pleading that states a claim for relief must contain: . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a). In determining the propriety of dismissal under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim, the court must "take the complaint's well-pleaded factual allegations as true and draw all reasonable inferences in [the plaintiff's] favor from those allegations." *Abcarian v. McDonald*, 617 F.3d 931, 933 (7th Cir. 2010) (citing *London v. RBS Citizens, N.A.*, 600 F.3d 742, 745 (7th Cir. 2010)). Dismissal under Rule 12(b)(6) is required if the complaint fails to describe a claim that is plausible on its face. *Sharp Elecs. Corp. v. Metro. Life Ins. Co.*, 578 F.3d 505, 510 (7th Cir. 2009) (citing *Ashcroft v. Iqbal*, 566 U.S. 662, 129 S.Ct. 1937, 1949 (2009)).

A complaint is not required to contain detailed factual allegations, but it is not enough merely that there might be some

conceivable set of facts that entitles the plaintiff to relief. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A plaintiff has an obligation under Rule 8(a)(2) to provide grounds of his entitlement to relief, which requires more than labels and conclusions. *Id.* Factual allegations, taken as true, must be enough to raise a right to relief above the speculative level. *Id.*

The Seventh Circuit has instructed that plaintiffs may not "merely parrot the statutory language of the claims that they are pleading (something that anyone could do, regardless of what may be prompting the lawsuit)" but must provide "some specific facts to ground those legal claims." *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009). The court clarified the standard for dismissal under Rule 12(b)(6) as follows:

> First, a plaintiff must provide notice to defendants of her claims. Second, courts must accept a plaintiff's factual allegations as true, but some factual allegations will be so sketchy or implausible that they fail to provide sufficient notice to defendants of the plaintiff's claim. Third, in considering the plaintiff's factual allegations, courts should not accept as adequate abstract recitations of the elements of a cause of action or conclusory legal statements.

*Id.*


## Judicial Notice

Generally, in ruling on a motion to dismiss under Rule 12(b)(6), a court may consider only the plaintiff's complaint.

*Rosenblum v. Travelbyus.com Ltd.*, 299 F.3d 657, 661 (7th Cir. 2002). In the usual case, therefore, if a party moving for a such dismissal submits documents with its motion, the Court either must ignore the documents or convert the motion to one for summary judgment. See *Venture Assoc. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993). However, "[a] court may consider judicially noticed documents without converting a motion to dismiss into a motion for summary judgment." *Menominee Indian Tribe of Wisconsin v. Thompson*, 161 F.3d 449, 456 (7th Cir. 1998). The Seventh Circuit has stated that it is proper to take judicial notice of such things as historical documents, documents contained in the public record, reports of administrative bodies, and state court decisions. See *520 South Michigan Ave. Associates, Ltd. v. Shannon*, 549 F.3d 1119, 1138, n. 14 (7th Cir. 2008) (citing *In re Salem*, 465 F.3d 767, 771 (7th Cir. 2006)); *Sledge v. Bellwood School Dist. 88*, 2010 WL 1579920, *4, No. 09-cv-4186 (N.D.Ill. Apr. 20, 2010) (taking judicial notice of state court orders and filings).

Here, in a footnote in its motion to dismiss, the HASB renews its previous request that the Court "take judicial notice of a certified copy of a 'Prejudgment Order of Possession of Real Property' awarding possession of apartment #416 at 628 Western Avenue to the HASB and directing the Sheriff to serve an order on Plaintiff William Smith and seize the property." In its reply

brief, again via a footnote, the HASB also asks the Court to take judicial notice of a copy of the docket sheet for the HASB's immediate possession action. The Smiths do not object to the Court taking judicial notice of the "Prejudgment Order of Possession of Real Property," but they do object to the judicial notice of the docket sheet, stating that the docket sheet only shows "summaries" of entries made in the case and "shows nothing about the issues actually litigated." (See DE #52.) They request that the full judicial record of the Indiana small claims action be placed before the Court so that they may present the Court with arguments regarding the proper "context" of the state court proceeding in relation to the allegations of the Amended Complaint. (See *Id*.) In response, the HASB points out that the Smiths do not dispute that, according to the docket sheet, the immediate possession against William Smith ended on August 29, 2008, nor do they dispute that the docket sheet is part of the public record.

To the extent that the Court will reference the "Prejudgment Order of Possession of Real Property" to discuss Mr. Smith's wrongful eviction claims, the request for judicial notice is **GRANTED**. As to the request for judicial notice of the docket sheet, as will be explained further below, the Court need not refer to that docket sheet for purposes of this motion and **DENIES** the HASB's request. As such, the Smiths request that the remainder of the Indiana small claims action be placed before the Court and that

they have an opportunity to address that record is **DENIED AS MOOT**.

The *Rooker-Feldman* Doctrine as Applied to the Smiths' Eviction
Claims

In its original order of dismissal, the Court noted that the
Smiths had not adequately explained why Mr. Smith's eviction claims
were not inextricably intertwined with the state court eviction
determination.  In their Amended Complaint, the Smiths allege that,
prior to their marriage, the HASB "took actions to evict" William
Smith from his previous apartment while he was hospitalized and
"seriously ill" in retaliation for making repeated complaints about
the conditions and services at the Property; these facts are not
specifically referenced in the Causes of Action section of the
Amended Complaint.  The HASB contends that, under the *Rooker-
Feldman* doctrine, this Court does not have jurisdiction over any of
the claims that are inextricably intertwined with the state court
eviction action.  In their response, the Smiths argue that the
"Order of Immediate Possession," relied upon by the HASB to show
the applicability of *the Rooker-Feldman* doctrine, is not a final
judgment of a state court, that the claims presented are not
intertwined with the state court order, and that Indiana does not
require compulsory counterclaims in small claims court, so the
state court order does not have preclusive effect.  Moreover, the
Smiths state that the wrongful eviction language included in their

Amended Complaint does not seek to "attack" the state court judgment but rather seeks to litigate independent claims.

The *Rooker-Feldman* doctrine prohibits federal district courts from reviewing state court civil judgments, including all claims that are inextricably intertwined with those judgments. *See District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983); *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923). The *Rooker-Feldman* doctrine is based upon recognition of the fact that lower federal courts generally do not have the power to exercise appellate review over state court decisions. In *Rooker*, the Supreme Court held that even if a state court decision was wrong, only the Supreme Court has the power to reverse or modify that judgment, since the jurisdiction of federal district courts is strictly original. *Rooker*, 263 U.S. at 415-16. Similarly, the Supreme Court in *Feldman* held that "a United States District Court has no authority to review final judgments of a state court in judicial proceedings." *Feldman*, 460 U.S. at 482. This circuit has consistently emphasized that "[t]aken together, *Rooker* and *Feldman* stand for the proposition that lower federal courts lack jurisdiction to engage in appellate review of state-court determinations." *Ritter v. Ross*, 992 F.2d 750, 753 (7th Cir. 1993) (quotation omitted). The Supreme Court has noted, however, that the *Rooker-Feldman* doctrine has been construed too broadly by some federal courts. *Exxon Mobil Corp. v. Saudi Basic Industries Corp.*,

544 U.S. 280, 283 (2005). Post-*Exxon*, the doctrine has been significantly narrowed and only applies to "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Kelley v. Med-1 Solutions, LLC*, 548 F.3d 600, 603 (7th Cir. 2008) (citations omitted). It has been emphasized that "[i]f a federal plaintiff present[s][an] independent claim, it is not an impediment to the exercise of federal jurisdiction that the same or a related question was earlier aired between the parties in state court." *Skinner v. Switzer*, --- U.S. ----, 131 S.Ct. 1289, 1297 (2011).

"In order to determine the applicability of the *Rooker-Feldman* doctrine, the fundamental and appropriate question to ask is whether the alleged injury by the federal plaintiff resulted from the state court judgment itself or is distinct from that judgment." *Garry v. Geils*, 82 F.3d 1362, 1365 (7th Cir. 1996). "If the alleged injury resulted from the state court judgment itself, *Rooker-Feldman* directs that the lower federal court lacks jurisdiction." *Id.* The key element in a *Rooker-Feldman* analysis is whether the federal claim alleges that the injury was caused by the state court judgment, or, alternatively, whether the federal claim alleges an independent prior injury that the state court failed to remedy. *Long v. Shorebank Development Corp.*, 182 F.3d

548, 555 (7th Cir. 1999). "A plaintiff may not circumvent the
effect of the *Rooker-Feldman* doctrine simply by casting [a]
complaint in the form of a federal civil rights action." *Maple*
*Lanes, Inc., v. Messer*, 186 F.3d 823, 825 (7th Cir. 1999).

A Court may "look beyond the four corners of the complaint to
discern the actual injury claimed by the plaintiff." *Crawford v.*
*Countrywide Home Loans, Inc.*, 647 F.3d 642, 646 (7th Cir. 2011)
(citing *Johnson v. Orr*, 551 F.3d 564, 568 (7th Cir. 2008)). The
Seventh Circuit has further noted that, where a claim alleges an
independent ground for relief, the *Rooker-Feldman* doctrine does not
present a bar when the district court could fashion relief that
would not upset the state court's determination. *Id.* at 647
(citing *Remer v. Burlington Area Sch. Dist.*, 205 F.3d 990, 998 (7th
Cir. 2005).

The Court has reviewed the Smiths' Amended Complaint as well
as their response brief to determine the applicability of the
*Rooker-Feldman* doctrine to their claims. Here, whether or not
William Smith's eviction claims are barred by *Rooker-Feldman* hinge
on the injuries alleged. In this case, the Smiths appear to allege
that their injuries (generally described in their Amended Complaint
as economic loss, loss of quiet enjoyment of their property,
apprehension, fear, worry, humiliation, and physical and mental

impact as a consequence of the HASB's actions)[3] arise because of the harassment and retaliatory actions of the HASB and not from the actual completed eviction itself. The Amended Complaint alleges that the HASB "took actions to evict" William Smith from his previous apartment. This is confirmed by the 'Prejudgment Order of Possession of Real Property,' which has been judicially noticed by this Court. The Amended Complaint does not, however, reference the final eviction of William Smith, nor does it request that the final state court eviction determination be reviewed or overturned. In fact, in the same paragraph that mentions the eviction actions, the Smiths point out that they are now married and reside together in Lubirta Smith's apartment. It is reasonable to infer from this statement that William Smith does not desire to re-let his previous apartment. See *Clabault v. Shodeen Management*, 2006 WL 1371460, *3, No. 05 C 5482 (N.D.Ill. May 15, 2006) (stressing the importance of looking to the plaintiff's alleged injury and request for relief in determining that the *Rooker-Feldman* doctrine applied to bar her claims, in part, because the plaintiff desired to re-let her

---

[3] In their response brief, the Smiths also assert that additional "plausible claims of injuries" are set forth in their Amended Complaint. They point out that a dysfunctional toilet, broken air conditioner, and absence of elevator service are injurious to a disabled person such as William Smith. They also assert that Lubirta Smith was injured by things such as the mold problems and sickening odors of the building. They assert that they were injured by the retaliatory actions of the HASB in that the HASB failed to remedy any of the complained of problems. Finally, they state that "[f]rom the existence alone of the deplorable conditions alleged by the Smiths in [the Property], this Court may infer that injuries resulted." None of these injuries reference the eviction. (See DE #50, pp. 10-11.)

apartment).  In their response brief, the Smiths assert that the
attempted eviction "states a claim for post-acquisition
discrimination under the Fair Housing Act."  Thus, the Court finds
that the Smiths are attempting to allege independent injuries and
violations, separate from the state court eviction itself.  See
*Bloch v. Frischholz*, 587 F.3d 771, 782 (7th Cir. 2009) (recognizing
42 U.S.C. sections 3604(a), (b) prohibit discriminatory evictions
and constructive evictions while 42 U.S.C. section 3617 prohibits
*attempted* discriminatory evictions) (emphasis in original).  The
Court need not review the state court's eviction determination to
discuss the merits of the Smiths' claims in this context, nor would
it need to upset the eviction determination to fashion appropriate
relief if the Smiths succeed on their claims.  Thus, the *Rooker-
Feldman* doctrine does not act as a bar to William Smith's eviction
claims.[4]


Bullying Claim

    The Smiths allege in the Facts section of their Amended
Complaint that the HASB staff members "acquiesced in the bullying
of Mr. Smith by at least one other resident and did nothing to
intervene and stop the bullying."  This single sentence is not

_____

    [4]  Should it become clear at a later phase in these proceedings that the
Smiths are indeed attacking the state court judgment itself or requesting
relief associated with overturning that judgment, the Court may *sua sponte*
reconsider the issue and parties may reinstate their arguments regarding the
*Rooker-Feldman* doctrine.

specifically linked to any of the Causes of Action listed. The HASB argues that the Smiths' independent bullying claims, if any, are not actionable because the alleged tenant-on-tenant harassment does not give rise to landlord liability. In their response, the Smiths do not dispute that the bullying claim is not in-and-of-itself actionable but instead argue that "[i]gnoring the [tenant-on-tenant] bullying is one way that HASB could retaliate against Mr. Smith."

The Court can discern no separate actionable claim in violation of any particular law or legal principle against the HASB on the face of the Amended Complaint with regard to the alleged tenant-on-tenant bullying of William Smith. As such, any attempted separate and distinct bullying claim is **DISMISSED WITH PREJUDICE** for failure to state a claim. To the extent the Smiths have clarified that their bullying allegations are simply a part of their retaliation claims, those issues will be addressed by the Court below.


Race Based Claims

Discriminatory Segregation Claim

In the Facts section of their Amended Complaint, the Smiths appear to be alleging that they were subjected to segregation on account of their race due to the location of the Property in a primarily non-Caucasian neighborhood; however, these facts are not

referenced in any of the enumerated claims in the Causes of Action section of the Complaint. The HASB argues that these claims are conclusory and sketchy and that they should fail because the Smiths have not alleged any discriminatory intent on the part of the HASB.[5] In response, the Smiths argue that the Elements of Damages section of their Amended Complaint states that they are seeking damages under each cause of action for "wanton and outrageous conduct." They proceed to quote from Black's Law Dictionary to define wanton and malicious, and they urge the Court to draw the "reasonable inference" that this language from the Elements of Damages section shows that the HASB acted intentionally to segregate the Property. The Smiths again point out that they base these claims on the *Gautreaux* litigation.

In its original dismissal order, this Court analyzed the series of cases that form the basis of the Smiths' *Gautreaux* claims. In the *Gautreaux* cases, African American tenants in Chicago brought actions against the Chicago Housing Authority ("CHA") and HUD claiming that, over a period of fifteen years, the CHA "deliberately selected [public housing] sites to 'avoid the placement of Negro families in white neighborhoods'" and that HUD had "'assisted in the carrying on and continues to assist in the carrying on of a racially discriminatory public housing system

---

[5] Indeed, the original Complaint contained language stating that the "concentration is the result of intentional actions or deliberate indifference of Defendants or their predecessors in office." This language is absent from the Amended Complaint.

within the City of Chicago' by providing financial assistance and other support for CHA's discriminatory housing projects." *Hills v. Gautreaux*, 425 U.S. 284, 286-87 (1976).  In the preceding phases of the litigation, the lower courts found that the CHA had violated the respondents' constitutional rights by "selecting public housing sites and assigning tenants on the basis of race" and that HUD had committed violations "by knowingly sanctioning and assisting CHAs racially discriminatory public housing program," *Id*. at 287-89 (citing *Gautreaux v. Chicago Housing Authority*, 296 F.Supp. 907 (D.C.Ill. 1969) and *Gautreaux v. Romney*, 448 F.2d 731, 739-40 (7th Cir. 1971)).  The cases were eventually consolidated and the parties were ordered to formulate "a comprehensive plan to remedy the past effects of unconstitutional site selection procedures." *Id*. at 290.  The question presented to the Supreme Court concerned only whether the lower court had the authority to order HUD to take remedial action outside the city limits of Chicago.  *Id*. at 296. The Supreme Court concluded that, when parties are found to have violated the Constitution, federal courts do have the authority to order them to undertake remedial efforts beyond the municipal boundaries of the city where the violation occurred.  *Id*. at 298-99.

In the lower phases of the litigation, however, the CHA moved to dismiss several counts of the complaint arguing that the plaintiffs failed to state a claim upon which relief could be

granted because it was not alleged that the CHA implemented their public housing site selection policy with the deliberate intent to segregate the races. *Gautreaux v. Chicago Housing Authority*, 265 F.Supp. 582, 584 (D.C.Ill. 1967). In granting the CHA's motion to dismiss[6], the court stated:

> To accept plaintiffs' contention that allegation and proof of an intent to discriminate among the races is unnecessary is to conclude that the mere placement of public housing projects that will in all probability be occupied largely by tenants of a specific race in neighborhoods containing a significant number of residents of the same race is in itself an act of discrimination forbidden by the Fourteenth Amendment, regardless of the many other factors, imposed here by statute, such as need, cost, and rehabilitation of deteriorating neighborhoods. The Constitution compels no such conclusion; rather it commands only that defendants administer the site selection aspect of their housing program untainted by any design to concentrate Negro or white tenants in some areas to the exclusion of other areas.

*Id.*

Here, the factual allegations in the Smiths' Amended Complaint are again stated in only general terms as applied to their *Gautreaux* arguments. In the Facts section of their Amended

---

[6] Specifically, the court held that: "[P]laintiffs must in fact prove, or prove facts from which the inference necessarily follows, that defendants were prompted in their selection of sites at least in part by a desire to maintain concentration of Negroes in particular areas or to prevent them from living in other areas. A public housing program, conscientiously administered in accord with the statutory mandates surrounding its inception and free of any intent or purpose, however slight, to segregate the races, cannot be condemned even though it may not affirmatively achieve alterations in existing patterns of racial concentration in housing, however desirable such alterations may be. A showing of affirmative discriminatory state action is required." *Gautreaux v. Chicago Housing Authority*, 265 F.Supp. 582, 584 (D.C.Ill. 1967).

Complaint, the Smiths state that the Property, the HASB complex, and the neighborhood in general are "populated overwhelmingly by residents who are African American and not Caucasian," many of whom are individuals with disabilities, and that the "concentration of non-Caucasion residents" is "far out of proportion to the corresponding population figures for the City of South Bend or the County of St. Joseph, IN."

There is no mention in the Amended Complaint of intentional discriminatory conduct on the part of the HASB or its predecessors as to the site selection policy, an intentional continuing violation by the HASB in implementing segregation practices, or any other racially discriminatory actions by the HASB that would form the basis of a *Gautreaux* claim as described above. Indeed, the Court can discern no facts related to particular actions by the HASB, whether intentionally discriminatory or not, that would pertain to the segregation claims, other than that the Property is populated largely by African Americans and that the concentration of residents is out of proportion to the surrounding areas. This is simply not enough to sustain a segregation claim. The Smiths' general assertion that all conduct was "wanton and outrageous" does not save these claims, especially in light of the fact that particular segregation "conduct" is not identified on the face of the Amended Complaint. The Court again finds that such conclusory allegations coupled with sketchy details overall are simply not

enough to provide the HASB with fair notice of the Smiths'
segregation claims and the grounds of their entitlement to relief.
As such, these claims are **DISMISSED WITH PREJUDICE.**


Race Based Fair Housing Act Claims

For their First Claim, the Smiths argue that they have been
discriminated against on the basis of race (and handicap which will
be discussed separately below) under the Fair Housing Act ("FHA"),
as amended, 42 U.S.C. section 3601 et. seq.  Although the Smiths do
not reference the particular sections upon which they rely to form
the basis of their claims, the Court notes that the FHA provides
that it shall be unlawful-

> (a) To refuse to sell or rent after the making
> of a bona fide offer, or to refuse to
> negotiate for the sale or rental of, or
> otherwise make unavailable or deny, a dwelling
> to any person because of race, color,
> religion, sex, familial status, or national
> origin.
>
> (b) To discriminate against any person in the
> terms, conditions, or privileges of sale or
> rental of a dwelling, or in the provision of
> services or facilities in connection
> therewith, because of race, color, religion,
> sex, familial status, or national origin.

42 U.S.C. § 3604(a), (b).  The FHA also makes it unlawful-

> to coerce, intimidate, threaten, or interfere
> with any person in the exercise or enjoyment
> of, or on account of his having exercised or
> enjoyed, or on account of his having aided or
> encouraged any other person in the exercise or
> enjoyment of, any right granted or protected
> by section 3603, 3604, 3605, or 3606 on this

title.

42 U.S.C. § 3617.

The Seventh Circuit has held that, in certain limited circumstances, post-sale discrimination may be actionable under the FHA. See generally *Bloch v. Frischholz*, 587 F.3d 771 (7th Cir. 2009); see also *Halprin v. Prairie Single Family Homes of Dearborn Park Ass'n*, 388 F.3d 327 (7th Cir. 2004). Section 3604(a) "may reach post-acquisition discriminatory conduct that makes a dwelling unavailable to the owner or tenant" because of their race. *Bloch*, 587 F.3d at 777. Section 3604(b) "may encompass the claim of a current owner or renter . . . for actual or constructive eviction." *Id*. at 779 (citing *Cox v. City of Dallas*, Tex., 430 F.3d 734, 746 (5th Cir. 2005). HUD[7] regulations extend the protections of section 3604(b) to prohibit "[l]imiting the use of privileges, services, or facilities associated with a dwelling *because of race* [or] . . . handicap . . . of an owner, tenant or a person associated with him or her." 24 C.F.R. § 100.65(b)(4) (emphasis added); see also *Bloch*, 587 F.3d at 780-81. Discrimination can be proven under section 3604 by showing either discriminatory intent or, in certain circumstances, by using a modified disparate impact theory. *Id*. at 784 (citing *Metropolitan Housing Development Corp. v. Village of Arlington Heights*, 558 F.2d 1283, 1290 (7th Cir. 1977). However, the Seventh Circuit has refrained from holding

_____

[7] HUD is the agency responsible for implementing the FHA.

that "a discriminatory impact alone always violates the Act."
*Gomez v. Chody*, 867 F.2d 395, 402 (7th Cir. 1989).

Section 3617 provides an independent post-acquisition discrimination claim that is more broadly prohibitive of conduct than actual deprivation of the rights described in sections 3604(a) and (b). *Id.* at 781. For example, HUD regulation 24 C.F.R. section 100.400(c)(2) protects against discrimination by prohibiting "[t]hreatening, intimidating or interfering with persons in their enjoyment of a dwelling *because of the race* [or] . . . handicap . . . of such persons, or of visitors or associates of such persons." *Id.* (emphasis added).[8] Also germane to claims brought under section 3167 is HUD regulation 24 C.F.R. section 100.400(c)(2), which prohibits "interfering with persons in their *enjoyment of a dwelling because of the race* [or] handicap of such persons." *Id.* at 782 (emphasis added).

The necessary elements of a section 3617 claim are (1) that the plaintiff is a protected individual under the FHA; (2) that the plaintiff was engaged in the exercise or enjoyment of fair housing rights; (3) that the defendants coerced, threatened, intimidated, or interfered with the plaintiff because of a protected activity under the FHA; and (4) the defendants were motivated by an intent to discriminate. *Id.* at 783 (citing *East-Miller v. Lake County*

---

[8] A person need not vacate the premises to bring a claim under section 3167 for coercion, intimidation, interference, threats, and interference. *Bloch*, 587 F.3d at 782.

-24-

*Highway Dept.*, 421 F.3d 558, 563 (7th Cir. 2005). The actions by the defendant must form a pattern of harassment, and intentional discrimination is a key element of this type of claim. *Id*. Intentional discrimination may be shown directly (through direct or circumstantial evidence) or indirectly (via the *McDonnell-Douglas* burden shifting test). *East-Miller*, 421 F.3d at 563.

As to the Smith's race based FHA claims, they reiterate that they are African American and that the HASB and its employees "harassed [them] for complaining about illegal conditions on behalf of [themselves] and other HASB residents who were individuals with handicaps or African American or both." They further state that the HASB "failed to administer its responsibilities in the operation and maintenance of the [Property], in a manner which recognized the heavy concentration of residents in the building who were individuals with handicaps or African American or both, and all of whom were poor." While the Facts section of the Amended Complaint contains many allegations related to the condition of the building and the HASB's actions with regard to those conditions, the Amended Complaint does not connect those actions to the Smiths' race in any way. The statements in regard to the location of the Property and the concentration of non-Caucasian residents does not serve to bridge that gap. In their response brief, the Smiths argue that they have "state[d] claims for racial discrimination under all causes of action pleaded and are not deficient under any

cause of action pleaded."[9]  (DE #50, p. 12.)  These bare assertions
are simply not enough to save these claims.  Nor is the Smiths'
argument that their use of the phrase "wanton and outrageous
conduct" in the Elements of Damages section of the Amended
Complaint supplies the necessary showing of discriminatory intent
as to these race based claims.  See *Iqbal*, 129 S.Ct. at 1954 (it is
not enough for a plaintiff to allege discriminatory intent
generally, and courts are not required to "credit a complaint's
conclusory statements without reference to its factual context.").
None of the allegations in the Amended Complaint plausibly suggest
racially discriminatory intent on the part of the HASB as is
required to proceed on claims of disparate treatment under the FHA.
See *Bloch*, 587 F.3d at 784; see also *A.B. ex rel. Kehoe v. Housing
Authority of South Bend,* 2011 WL 4005987, *5, 3:11-CV-163 (N.D.Ind.
Sept. 8, 2011) (finding that plaintiff's complaint failed to state
a disparate treatment claim because it contained "precisely the
type of general allegations, devoid of any factual enhancement,
that the courts in *Iqbal* and *Brooks* rejected as conclusory.").

    As noted above, in certain circumstances, discrimination can
be shown by using a modified disparate impact theory under section
3604.  However, the Smiths' Amended Complaint does not identify any

---

[9] In support of this position they again state that they are African
American, that they have alleged that the HASB acted wantonly, and that the
Property and its neighborhood are populated overwhelmingly by non-Caucasian
residents.  (DE #50, pp. 11-12.)

policy or practice by the HASB that disparately affects African Americans, nor do they mention disparate impact or address any of these issues in their response brief.  See *A.B. ex rel. Kehoe,* 2011 WL 4005987 at *7 (dismissing disparate impact claim when the plaintiff failed to develop argument or identify a policy having a disparate impact on the disabled).  The reasoning in the preceding section regarding the Smiths' *Gautreaux* claims applies equally here.  The Smiths' race based FHA claims are stated in general, sketchy, and conclusory terms at best; as such, these claims are **DISMISSED WITH PREJUDICE.**


Disability Based FHA, Rehabilitation Act and Americans with
Disabilities Act ("ADA") Claims

For part of their First Claim and for their Second and Third Claims, the Smiths argue that the HASB has violated the FHA, the Rehabilitation Act and the ADA in that they have discriminated against William Smith on the basis his disability and against Lubirta Smith because of her association with William Smith.  The FHA, the Rehabilitation Act, and the ADA all protect people with disabilities from discrimination by a public entity.  Section 504(a) of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to

discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a). Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity." 42 U.S.C. § 12132. The FHA prohibits discrimination in housing on the basis of disability in that it is illegal-

> (1) To discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of-(A) that buyer or renter, . . .
>
> (2) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of-(A) that person.

42 U.S.C. § 3604(f)(1)-(2). Finally, as described more fully above, 42 U.S.C. section 3617 provides an independent post-acquisition discrimination claim on the basis of a person's disability or on the basis of a person's association with a disabled person. Thus, courts have found that, based on the three statutes, disability discrimination can take several forms including disparate treatment, disparate impact, a refusal to permit "reasonable modifications of existing premises," a "refusal to make reasonable accommodations in rules, policies, practices, or services," or a failure to "design and construct handicap

accessible building." *Keys Youth Services, Inc. v. City of Olathe, KS*, 248 F.3d 1267, 1272-73 (10th Cir. 2001).

Here, the Smiths allege that the HASB failed to maintain the Property in compliance with the collective Acts and implementing rules which require the property be accessible to and usable by individuals with handicaps. They also reiterate that the HASB and its employees "harassed [the Smiths] for complaining about illegal conditions on behalf of [themselves] and other HASB residents who were individuals with handicaps or African American or both," and they further state that the HASB "failed to administer its responsibilities in the operation and maintenance of the [Property], in a manner which recognized the heavy concentration of residents in the building who were individuals with handicaps or African American or both, and all of whom were poor." In support of these allegations, the Facts section of the Amended Complaint provides that the Property was infested with roaches and that the toilet, air conditioner, and elevators were broken and "did not function for several weeks at a time." The broken elevator forced William Smith to carry his bicycle up the stairs and "resulted in the denial or limitation of physical access to other residents with handicaps or disabilities." Lubirta Smith's apartment had filthy carpet and mold issues. The Property also had sickening odors, open electrical light sockets, and dirty common areas. The Amended Complaint alleges that the HASB retailed against the Smiths by

failing to remedy the problems the Smiths' complained of and by treating them poorly. It can also be inferred from the Amended Complaint that the attempted eviction of William Smith was a form of retaliation. Finally, the Smiths allege that they were the recipients of this retaliation because "they acted as advocates for other residents in the [Property] who had problems with [the] HASB maintenance, service, and management deficiencies." These other residents they acted as advocates for are described as "vulnerable" persons with disabilities.

The HASB argues that these claims fail because the Amended Complaint does not allege that the Smiths complained about a protected activity and that their claims of disability discrimination are not causally connected to the actions allegedly taken by the HASB. The Court disagrees. As noted above, the Smiths describe William Smith's disability, state that the HASB knew of such disability, and allege that they complained about the illegal conditions of the Property (including a broken elevator) which would affect William Smith's disability as well as present barriers to him and other disabled residents. They also assert that the HASB then failed to remedy the complained of problems, that the Smiths were instead retaliated against because of their complaints, and that they were injured by way of the foregoing.[10]

_____

[10] The HASB states that the Smiths have not adequately alleged that they were injured. As will be discussed in more detail below, the Court finds, giving the Smiths the benefits of inference to which they are entitled at this

These allegations are at least plausibly connected to William Smith's disability, and, unlike the race-based allegations, the facts presented with regard to disability discrimination give rise to a reasonable inference of discriminatory intent. Thus, giving the Smiths the benefits to which they are entitled at this stage, these claims **REMAIN PENDING**.


Federal Constitutional Claims

For their Fourth Claim, the Smiths state that the HASB has violated their "right to due process and equal protection under the Fourteenth Amendment to the Constitution of the United States as applied to [the HASB] by 42 U.S.C. sec 1983, a statute guaranteeing rights to [the Smiths]. These violations under sec. 1983 arise, in part, because [the HASB], acting under color of law, violated the legal provisions in the preceding and following claims." In their motion to dismiss, the HASB points out that this broad assertion on the face of the Amended Complaint gives them no notice of what the basis of the Smiths' claims are or how they are entitled to relief; they further point out that the Smiths do not even state whether their claims are procedural or substantive in nature. In response, the Smiths state, in full:

---

stage, that the conditions described in the Amended Complaint are sufficient to put the HASB on notice that those conditions could have proximately caused the Smiths' injuries and damages. In other words, from the facts presented in the Amended Complaint, it is reasonable to infer that the injuries described, albeit in general terms, were a foreseeable consequence of the conditions complained of and the HASB's failure to remedy them.

At page 18, [the] HASB contends that the
Smiths do not state a claim because they do
not set forth sufficient allegations to
establish due process or equal protection
violations. [The] HASB ignores their
allegations that the violations were wanton.
It does not recognize the decision in *Indiana
Protection and Advocacy Services v. Indiana
Family and Social Services Admin.*, 573 F.3d
548 (7th Cir. 2009), which cites with approval
the decision in *Maine v. Thiboutot*, 448 U.S. 1
(1980). *Thiboutot* held that a plaintiff
stating a claim that a state actor violated a
federal statute also stated a claim under 42
U.S.C. § 1983 for violation of the Fourteenth
Amendment. *Id.*, at 4-5. [The] HASB is not an
arm of the state of Indiana, as was the
Indiana Family and Social Services
Administration. Therefore, [the] HASB cannot
interpose an Eleventh Amendment bar to this
Court's jurisdiction, as the Seventh Circuit
allowed in *Indiana Protection and Advocacy
Services*. The Smiths state a claim under the
Fourteenth Amendment.

(DE #50, p. 15.) The Smiths do not describe how the facts
presented in their Amended Complaint relate to their federal
constitutional claims. They do not describe any potential
procedural due process claims related to the "attempted eviction"
of William Smith and instead specifically assert that, "in the
context of the First Amended Complaint," these actions "state[] a
claim for post-acquisition discrimination under the Fair Housing
Act." Furthermore, the broad assertion in the Amended Complaint
that "[t]hese violations under sec. 1983 arise, in part, because
[the HASB], acting under color of law, violated the legal
provisions in the preceding and following claims," does not give
the HASB proper notice of the basis of the Smiths' allegations.

See *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009) (plaintiffs may not "merely parrot the statutory language of the claims that they are pleading (something that anyone could do, regardless of what may be prompting the lawsuit)" but must provide "some specific facts to ground those legal claims); *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991) ("We repeatedly have made clear that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived (even where those arguments raise constitutional issues).").  The Smiths were granted leave to file an Amended Complaint to clarify their causes of action; with regard to their Fourteenth Amendment claims, they did not adequately do so.  As such, these claims are stated in general, sketchy, and conclusory terms at best and are **DISMISSED WITH PREJUDICE**.

Smiths assert that, under Indiana law, the HASB has failed to "provide them with due course of law as guaranteed to Plaintiff's by the Constitution of the State of Indiana, Article I, sec. 23.  These violations under sec. 1983 arise, in part, because [the HASB], acting under color of law, violated the legal provisions in the preceding and following claims."  The HASB argues that this claim is also improperly plead. In response, the Smiths point out that several Indiana cases have

See *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009) (plaintiffs may not "merely parrot the statutory language of the claims that they are pleading (something that anyone could do, regardless of what may be prompting the lawsuit)" but must provide "some specific facts to ground those legal claims); *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991) ("We repeatedly have made clear that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived (even where those arguments raise constitutional issues).").  The Smiths were granted leave to file an Amended Complaint to clarify their causes of action; with regard to their Fourteenth Amendment claims, they did not adequately do so.  As such, these claims are stated in general, sketchy, and conclusory terms at best and are **DISMISSED WITH PREJUDICE**.

State Due Course of Law Claim

For their Fifth Claim, the Smiths assert that, under Indiana law, the HASB has failed to "provide them with due course of law as guaranteed to Plaintiff's by the Constitution of the State of Indiana, Article I, sec. 23.  These violations under sec. 1983 arise, in part, because [the HASB], acting under color of law, violated the legal provisions in the preceding and following claims."  The HASB argues that this claim is also improperly plead. In response, the Smiths point out that several Indiana cases have

held that Indiana courts are not required to follow interpretations of federal law when looking at due course of law claims; however, they do not attempt to further clarify the specific claims presented in the Amended Complaint. Again, the Court finds that the Amended Complaint does not give the HASB proper notice of the basis of the Smiths' allegations. See *Brooks,* 578 F.3d at 581; *Berkowitz*, 927 F.2d at 1384. The Smiths were granted leave to file an Amended Complaint to clarify their causes of action; with regard to their state due course of law claim, they did not adequately do so. As such, these claims are stated in general, sketchy, and conclusory terms at best and are **DISMISSED WITH PREJUDICE**.

Habitability Claims

For their Sixth Claim, the Smiths assert that the HASB has failed to provide them with habitable premises. They bring this claim under Indiana law and under the FHA. Specifically, in the Facts section of their Amended Complaint they allege that the Property "failed to meet standards of habitability and peaceable enjoyment established by state and municipal law and incorporated into HUD requirements or established separately by HUD requirements." The Smiths do not state which HUD requirements have been violated in either their Amended Complaint or their response brief. The HASB points out that the FHA does not, in and of itself, require habitable premises but instead protects against

discrimination in the housing context. In their response, the Smiths do not dispute this but instead focus solely on habitability violations under Indiana law.

In their Amended Complaint, the Smiths fail to identify which Indiana law they rely on to bring their claim; however, in their motion to dismiss, the HASB points to Indiana Code sections 32-31-8-5 and 32-31-8-6 as possible options, and the Smiths do not refute this, nor do they point to any other statutory provisions, in their response brief. Therefore, the Court will address their claims pursuant to these sections of the Indiana Code which provide:

Sec. 5. A landlord shall do the following:

(1) Deliver the rental premises to a tenant in compliance with the rental agreement, and in a safe, clean, and habitable condition.

(2) Comply with all health and housing codes applicable to the rental premises.

(3) Make all reasonable efforts to keep common areas of a rental premises in a clean and proper condition.

(4) Provide and maintain the following items in a rental premises in good and safe working condition, if provided on the premises at the time the rental agreement is entered into:

(A) Electrical systems.

(B) Plumbing systems sufficient to accommodate a reasonable supply of hot and cold running water at all times.

(C) Sanitary systems.

(D) Heating, ventilating, and air

conditioning systems. A heating
system must be sufficient to
adequately supply heat at all times.

(E) Elevators, if provided.

(F) Appliances supplied as an
inducement to the rental agreement.

Ind. Code § 32-31-8-5. A tenant may bring an action against a
landlord if: (1) the tenant gives the landlord notice of the
alleged non-noncompliance; (2) the landlord was given a reasonable
amount of time to correct the problem or condition complained of;
and (3) the landlord ultimately fails to remedy the problem. Ind.
Code § 32-31-8-6.

In their Amended Complaint the Smiths have alleged numerous
problems related to the condition of the property including a
broken and flooding toilet, a roach infestation, broken elevators
and air conditioners, filthy carpet, open electrical light sockets,
and dirty common areas. The Smiths allege that the HASB staff
members "failed to remedy problems of which [the Smiths]
complained" and that they suffered "loss of quiet enjoyment of
their property; apprehension; fear; worry; humiliation; and
physical and mental impact" as a consequence of the actions of the
HASB. While the HASB argues that the Smiths only allege certain
conditions were "reported to the HASB" and that they have not
adequately alleged injury, the Court disagrees. The conditions
described are sufficient to put the HASB on notice that those
conditions could have proximately caused the Smiths' injuries and

damages. In other words, from the facts presented in the Amended
Complaint, it is reasonable to infer that the injuries described,
albeit in general terms, were a foreseeable consequence of the
conditions complained of and the HASB's failure to remedy them;
those alleged injuries would not have occurred if the requirements
of the statute had been observed.

The HASB points out that the Smiths do not allege that the
HASB was provided with notice under the Indiana Tort Claims Act.
See Ind. Code § 34-13-3 *et seq.* The Smiths, however, assert that
they are bringing these claims under a breach of contract theory
rather than a tort theory. The Smiths' position does have support
under Indiana law. See generally *Johnson v. Scandia Assoc., Inc.*,
717 N.E.2d 24 (Ind. 1999); see also *Schuman v. Kobets*, 760 N.E.2d
682, 685-86 (Ind. Ct. App. 2002) (discussing the action of breach
of habitability warranties as contractual disputes and noting that
recovery on such claims will be limited and defined by the law of
contract). Thus, giving the Smiths the benefits to which they are
entitled at this stage, these claims **REMAIN PENDING.**


Third-Party Beneficiary Claim

For their Seventh Claim, the Smiths allege that the HASB has
"breached contracts of which [the Smiths] are intended third-party
beneficiaries." They state that these contracts are in the
possession of the HASB and that the leases "refer to the adoption

of portions of Title 24 of the Code of Federal Rules (CFR) into the leases and the imposition of the requirements of those rules by HUD on HASB as a prerequisite of HUD's granting of funds to HASB. These rules are published, in part, at 24 C.F.R. Part 966.4." The Smiths also state, via their reply, that they "allege habitability problems which violate the South Bend [municipal] ordinance" prohibiting rental of substandard property and that those claims are plausible because they are the "intended beneficiaries of the contract between HUD and HASB." Citing to *Fincher v. South Bend Heritage Foundation*, 606 F.3d 331 (7th Cir. 2010), the HASB argues that, in order for a housing authority resident to state a third party beneficiary claim, he or she must point to "specific regulations (or contract provisions) that are being violated . . . to give rise to a cause of action." *Id.* at 336. The HASB asserts that the Smiths have not adequately pointed to any such regulation.

The Court disagrees with the HASB. In *Fincher*, the plaintiff did not point to *any* specific regulation at the summary judgment phase that could stand in the place of a contract to support his claims. *Id.* Here, the Smiths at least point generally to 24 C.F.R. 966.4 and state that those regulations are being violated.[11] At this early stage, prior to discovery of the relevant contractual

---

[11] The Court notes that these regulations include reference to a housing authority's obligations under a tenant lease which include maintaining the unit and project in decent, safe, and sanitary condition, making necessary repairs, and keeping the project buildings, facilities, and common areas in a clean and safe condition. See 24 C.F.R. 966.4(e).

materials referenced by the Smiths,[12] this claim **REMAINS PENDING**.


<u>Title VI Claim</u>

Finally, for their Eighth Claim, the Smiths allege that the HASB has "violated the rights of [the Smiths] to be free of discrimination on the basis of race or color by recipients of federal financial assistance, as guaranteed by Title VI of the Civil Rights Act (Title VI), 42 U.S.C. 2000d, and implementing rules." A specific implementing rule is not referenced on the face of the Amended Complaint, nor do the Smiths provide such reference in their response. To support this claim, they outline the same alleged conduct of the HASB that they did pursuant to their race based discrimination claims. The HASB argues that the Smiths may not privately sue to enforce the implementing rule(s) and also that the claim fails because the Smiths have not alleged a sufficient link between their race and the HASB's alleged racially discriminatory actions.

Section 601 of Title VI provides that no person shall, "on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity" covered by Title VI. 42 U.S.C. § 2000d. Title VI prohibits only intentional

---

[12] In its previous order, the Court dismissed this claim because, other than the lease, the original Complaint did not mention any contract or funding agreement.

discrimination.  *Alexander v. Sandoval*, 532 U.S. 275, 281 (2001).
Furthermore, the Supreme Court has clarified that Title VI does not
create "a freestanding private right of action to enforce
regulations."  *Id*. at 293.

The Court has addressed the Smiths race based claims in detail
above and has found that the facts alleged in the Amended Complaint
do not sufficiently link the HASB's conduct to the Smiths' race;
nor can any discriminatory intent based on the Smiths' race be
inferred from the claims as presented.  As the HASB points out, the
Smiths do not plead any discriminatory statements or differential
treatment.  That the Smiths allege "wanton and outrageous conduct"
in the Elements of Damages section of the Amended Complaint does
not supply the necessary showing of discriminatory intent as to
these claims.  See *Iqbal*, 129 S.Ct. at 1954 (it is not enough for
a plaintiff to allege discriminatory intent generally, and courts
are not required to "credit a complaint's conclusory statements
without reference to its factual context.").  The Smiths' Title VI
claims are stated in general, sketchy, and conclusory terms at
best; as such, these claims are **DISMISSED WITH PREJUDICE**.


CONCLUSION

For the reasons set forth above, the motion is **GRANTED IN PART
AND DENIED IN PART**.  As is described more fully in the body of the
order, the motion is **GRANTED** to the extent that the Defendant seeks

-40-

to dismiss the Plaintiffs' Bullying, Discriminatory Segregation, Race Based Fair Housing Act, Federal Constitutional, State Due Course of Law, and Title VI claims. These claims are **DISMISSED WITH PREJUDICE**. However, the motion is **DENIED** to the extent that the Defendant seeks to dismiss the Plaintiffs' Disability Based Fair Housing, Rehabilitation Act, Americans with Disabilities Act, Habitability, and Third Party Beneficiary claims. These claims **REMAIN PENDING** before the Court.


**DATED: March 30, 2012**                    **/s/RUDY LOZANO, Judge**
                                             **United States District Court**