**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | | |
|---|---|---|
| WILLIAM AND LUBIRTA SMITH, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Case No.  3:09-CV-330-RL |
| | ) | |
| HOUSING AUTHORITY OF SOUTH | ) | |
| BEND, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S BRIEF IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT**

## I.    INTRODUCTION

William Smith and his wife, Lubirta, assert a number of disability discrimination claims under the Fair Housing Act, Americans with Disabilities Act, and the Rehabilitation Act based on Mr. Smith's alleged disability.  These claims fail for the threshold reason that Mr. Smith admitted he is *not* disabled.  In fact, Mr. Smith admitted he is not actually asserting a disability discrimination claim in this case at all.  Instead, Mr. Smith claims the Housing Authority of South Bend ("HASB" or "Housing Authority") wrongfully evicted him in retaliation for his complaints about a neighbor's disruptive behavior.  The *Rooker-Feldman* doctrine, however, deprives the Court of jurisdiction to resolve such a claim.  And, even if the Court had jurisdiction, Mr. Smith's disparate treatment claim – whether based on discrimination or retaliation – lacks merit for several reasons.  For example, Mr. Smith's complaints about a neighbor are not protected under the FHA, ADA or Rehabilitation Act. Moreover, Mr. Smith offers no evidence of discrimination or retaliation at all, and it is undisputed HASB evicted him because he repeatedly violated his lease through his disorderly conduct.

Mrs. Smith's disparate treatment claims fare no better. Mrs. Smith alleges HASB discriminated or retaliated against her by slightly delaying the approval of her Section 8 application and by evicting Mr. Smith. Mrs. Smith's discrimination claim fails because Mr. Smith is not disabled, and her eviction-based claims fail for the same reasons Mr. Smith's eviction claim fails. Her claims also fail because she did not suffer an adverse action. For instance, her Section 8 application was granted, and she and Mr. Smith voluntarily moved from public housing into Section 8 housing. Mrs. Smith's claims also fail because HASB had legitimate reasons for all of it actions, and she has no evidence to rebut the legitimacy of those actions. For example, HASB initially denied her Section 8 application based on its criminal background check in connection with the application and its consistently enforced policy of rejecting applicants when they or otherhousehold members have committed certain crimes.

Plaintiffs also habitability-based claims also fail. Plaintiffs allege state law habitability and third-party beneficiary claims, asserting HASB failed to remedy several maintenance problems, which made their public housing units uninhabitable. But the undisputed facts establish either that Plaintiffs' maintenance allegations did not involve actual problems or that HASB promptly resolved their concerns. Because HASB complied with its maintenance obligations under the lease and the law, habitability and third-party beneficiary claims fail as a matter of law. Plaintiffs' third-party beneficiary claim also fails because the damages Plaintiffs seek, *i.e.,* compensatory and punitive damages, cannot be recovered for an alleged breach of contract.

## II.   STATEMENT OF UNCONTESTED MATERIAL FACTS

### A.   William Smith's Eviction from Public Housing

Mr. Smith moved into HASB public housing on November 15, 2004.[1]  (Relevant Pages and Exhibits from William Smith's Deposition Transcript and Exhibits (**Ex. B**) pp. 96-97, Dep. Ex. 20; Lottie Aff. ¶ 8.)[2]  Mr. Smith lived in apartment 416 of HASB's high-rise building located at 628 Western Avenue, South Bend, Indiana.  (W Smith's Dep. p. 97; Lottie Aff. ¶ 8.)

HASB issued Mr. Smith three lease termination notices for violating his lease by disturbing the peaceful enjoyment of other tenants and engaging in disorderly conduct.  (Lottie Aff. ¶ 9; Affidavit of Kathy Mammolenti (**Ex. C**) ¶ 9.)  Specifically, the Housing Authority issued Mr. Smith a November 5, 2007 Notice of Good Cause, a March 24, 2008 Notice to Terminate Lease, and a May 16, 2008 Notice to Terminate Lease.  (Lottie Aff. ¶ 9; Mammolenti Aff. ¶ 9; March 24, 2008 Notice (**Ex. D**); May 16, 2008 Notice (**Ex. E**).)  The Housing Authority issued the May 16, 2008 Notice, which ultimately resulted in Mr. Smith's eviction, after Mrs. Smith (Mr. Smith's girlfriend at the time) reported to the police that Mr. Smith pulled her coat over her face and hit her on May 4, 2008.[3]  (May 16, 2008 Notice; May 4, 2008 Police Report (**Ex. F**).)  Indeed, Mr. Smith's assault and battery of Mrs. Smith, along with his many other prior lease violations for playing loud music and engaging in belligerent conduct, resulted in HASB issuing the May 16, 2008 Notice and filing an immediate possession action against

---

[1] The Housing Authority provides affordable housing for low and moderate income families throughout South Bend and a wide range of programs designed to increase the self-sufficiency of families receiving such assistance.  (Affidavit of Cornelius Lottie (**Ex. A**) ¶ 3.)  As part of its Public Housing program, the Housing Authority owns and operates high-rise apartments, low-rise units and single-family houses, which it rents to low and moderate-income families and individuals.  (*Id.*)

[2] Exhibits to this brief are referred to as "Ex."  Exhibits used during a deposition in this case are referred to as "Dep. Ex."

[3] Plaintiffs got married a few months later, on July 23, 2008.  (Relevant Pages and Exhibits from Lubirta Smith's Deposition Transcript (**Ex. G**) p. 323.)  Mrs. Smith's maiden name was Lubirta Blackmon, but HASB refers to her as Mrs. Smith throughout this Brief.

3

Mr. Smith on June 23, 2008.  (May 16, 2008 Notice; Lottie Aff. ¶ 10.)  HASB consistently issues lease termination notices to and pursues immediate possession actions against tenants who disturb the peaceful enjoyment of other tenants and engage in disorderly conduct multiple times. (Lottie Aff. ¶ 11.)

The St. Joseph Superior Court, Small Claims Division, granted HASB immediate possession at a July 7, 2008 hearing.  (W Smith's Dep. p. 35, Dep. Ex. 1; Lottie Aff. ¶¶ 10, 12, 13.)  Cornelius Lottie, HASB's Assistant Manager of Public Housing, appeared for HASB at the immediate possession hearing.  (Lottie Aff. ¶ 12; L Smith Dep. p. 325.)  Mr. Smith did not appear at the hearing because he was in the hospital for an emergency bowel obstruction; instead, Mrs. Smith (then Mr. Smith's girlfriend) appeared on his behalf.  (W Smith's Dep. pp. 223, 225-26; L Smith Dep. p. 233; Lottie Aff. ¶ 13.)  Mrs. Smith informed the court about Mr. Smith's medical condition and hospitalization at the immediate possession hearing.  (L. Smith's Dep. pp. 231-33.)  HASB had no knowledge of Mr. Smith's hospitalization or his medical condition before the immediate possession hearing.  (Lottie Aff. ¶ 12; W Smith's Dep. pp. 231-32; L Smith's Dep. p. 234; Affidavit of David Fleckner (**Ex. H**) ¶ 6; Mammolenti Aff. ¶ 10; Affidavit of Linda Brownlee (**Ex. I**) ¶ 14.)  Mr. Smith made a full recovery from his bowel obstruction, and after about one month, he returned to his normal routine and continued living the same way he did before the surgery.  (W Smith Dep. pp. 228-29, 328.)  Indeed, Mr. Smith required no assistance in caring for himself; he regained his strength; and he no longer used a walker and could walk long distances.  (W Smith Dep. p. 328.)

On July 23, 2008, shortly after Mr. Smith was evicted, he married Mrs. Smith and moved in with her.  (L Smith Dep. pp. 237, 323.)  Mrs. Smith lived in the same public housing building

as Mr. Smith, 628 Western Avenue, and her apartment, unit 403, was just down the hall from Mr. Smith's former unit.  (L Smith Dep. p. 74-75, Dep. Ex. 5; Mammolenti Aff. ¶ 11.)

As part of this lawsuit and their claimed damages, Plaintiffs challenge the St. Joseph County Superior Court order granting HASB immediate possession.  (L Smith Dep. pp. 235-36; W Smith Dep. pp. 124-26.)  Specifically, Mr. Smith claims the May 16, 2008 Notice was prepared in retaliation for complaints he made about his upstairs neighbor, Vaughn Steward.  (W Smith Dep. pp. 325-26.)  Mr. Smith claims he complained about Mr. Steward's music being too loud and alleged misconduct, including an alleged threat on Mr. Smith's life.  (W Smith Dep. pp. 61-63.)  In addition, Mr. Smith claims HASB treated Mr. Steward more favorably than he was treated.  (W Smith Dep. pp. 65, 286-87.)  While living in public housing, Mr. Steward received Social Security Disability Insurance benefits and, therefore, was disabled at least for purposes of such benefits.  (Mammolenti Aff. ¶ 19.)  Moreover, HASB did not ignore Mr. Steward's lease violations.  To the contrary, HASB issued Mr. Steward a Notice of Good Cause to Terminate Lease on November 13, 2006 for playing his guitar too loudly.  (Mammolenti Aff. ¶¶ 20-21.) HASB has no knowledge of any other lease violations by Mr. Steward.  (Mammolenti Aff. ¶ 21.) Mr. Steward ultimately voluntarily moved out of public housing on October 2, 2008, a few months after Mr. Smith's eviction.  (Mammolenti Aff. ¶ 22.)

### B.    Lubirta Smith's Section 8 Program Application

Mrs. Smith applied for the Housing Choice Voucher Program ("Section 8 Program"),[4] which is administered by the Housing Authority.  (Brownlee Aff. ¶ 8.) Mrs. Smith's Section 8 Program application listed both Mr. Smith and her as individuals who would be living in the

---

[4] The Housing Choice Voucher Program is the federal government's major program for assisting very low-income families, the elderly, and the disabled to afford decent, safe, and sanitary housing in the private market. The participant is free to choose any housing that meets the requirements of the program and is not limited to units located in subsidized public housing projects.  The HCVP was formerly known as and is referred to in this Brief as "Section 8 Program."  (Brownlee Aff.  ¶¶ 2, 3.)

residence.  (Brownlee Aff. ¶ 8.)   On May 28, 2009, the Housing Authority initially denied Mrs. Smith's Section 8 Program application because the HASB's security background check of the Smiths showed criminal activity on April 28, 2008.  (L Smith Dep. p. 227, Dep. Ex. 1-P; Brownlee Aff. ¶¶ 9, 15.)   HASB's policy prohibits Section 8 assistance to applicants when the applicant or any member of the applicant's household is currently engaged in, or has engaged in within the last three years, certain criminal activities, including drug-related criminal activity or criminal activity that threatens the health, safety or right to peaceful enjoyment of other residents or persons in the immediate vicinity.  (Brownlee Aff. ¶ 10.)  This requirement is rooted in federal regulations.  See 24 CFR § 982.552(c), § 982.553.  The HASB consistently enforces this policy and denies all Section 8 Program applications when the applicant or his or her household members have engaged in prohibited criminal activity.  (Brownlee Aff. ¶ 11.)  After receiving the May 28, 2009 notice denying Section 8 Program assistance, the Smiths both produced records from St. Joseph County Police showing they had no arrest records in the past three years. (L Smith Dep. pp. 227, 454, Dep. Exs. 1-D, 1-P; W Smith Dep. pp. 245-46, Dep. Ex. 2.)   On June 8, 2009, eleven days after the initial denial notice, and less than a week after HASB received the Smiths' arrest record history, HASB approved Mrs. Smith's Section 8 Program application.  (L Smith Dep. pp. 227-228, Dep. Exs. 1-O, 1-P; Brownlee Aff. ¶¶   13, 16.) Plaintiffs moved directly from 628 Western into Section 8 housing at 614 South Summit Drive on approximately August 31, 2009.  (Mammolenti Aff. ¶ 13; L Smith Dep. pp. 59-60; W Smith Dep. pp. 73-74.)   Nevertheless, Mrs. Smith claims HASB "tried to stop [her] from getting [her] Section 8" in retaliation for her complaints of associational discrimination and/or her association with Mr. Smith.  (L Smith Dep. pp. 244, 273-75.)  It is unclear, however, whether Mrs. Smith ever complained to anyone about associational discrimination.  Mrs. Smith initially testified she

complained about being treated unfairly because of Mr. Smith's health condition to Linda Brownlee, HASB's Assistant Manager of Section 8 (L Smith Dep. pp. 269-72), but later Mrs. Smith testified that she never mentioned Mr. Smith's health to Ms. Brownlee. (L Smith Dep. pp. 477, 482-83; Brownlee Aff. ¶¶ 14, 17). Moreover, according to Mrs. Smith, she "didn't voice" her belief that she was a victim of associational disability discrimination. (L Smith Dep. pp. 272-73). And, even if Mrs. Smith complained to Ms. Brownlee about associational discrimination, she made that complaint in July 2009, *after* Mr. Smith's eviction, *after* the temporary denial of Section 8 benefits, and *after* HASB granted her Section 8 benefits. (L Smith Dep. pp. 273-74, Dep. Exs. 1-O, 1-P; Lottie Aff. ¶¶ 9, 12, 13; Brownlee Aff. ¶¶ 9, 13, 15-16.)

### C.   Plaintiffs' Habitability Allegations

At all relevant times during Plaintiffs' tenancy,[5] HASB had a maintenance complaint process to accept and promptly remedy tenant maintenance concerns. (Fleckner Aff. ¶ 8.) Specifically, HASB instructs tenants to report maintenance concerns by calling the maintenance department hotline. (*Id*.) In response to such complaints, HASB's maintenance department generates a work order and assigns a maintenance technician to promptly remedy the problem. (*Id*.) Although the maintenance department's response time varies depending on the severity of the issue, HASB typically addresses non-emergency repair requests within one week. (Fleckner Aff. ¶ 9; W Smith Dep. p. 141.) Plaintiffs knew about and used this complaint process. (L Smith Dep. pp. 100-01; W Smith Dep. pp. 140-41.)

In addition to addressing tenant maintenance concerns through this complaint process, HASB public housing properties are thoroughly inspected at least twice each year. (Fleckner Aff. ¶¶ 10-11.) HASB contracts with a third-party inspection company to inspect each public

---

[5] The bulk (if not all) of Plaintiffs' allegations relate post-2005 issues. (L Smith Dep. pp. 81-82.) The maintenance system described in this Brief was in place from 2005 to August 2009, when Plaintiffs moved out. (Fleckner Aff. ¶ 12. )

housing unit every year.  (Fleckner Aff. ¶ 10.)  In addition, HASB employees inspect each public housing unit during the annual recertification process, during which the resident renews his or her lease.  (Fleckner Aff. ¶ 10; Mammolenti Aff. ¶ 20.)  The Department of Housing and Urban Development ("HUD") also inspects HASB public housing buildings either annually or every other year depending on the prior physical inspection score.  (Fleckner Aff. ¶ 11.)  HUD inspected Plaintiffs' building, 628 Western, in 2000, 2002, 2004, 2006, 2007, and 2009.  (Fleckner Aff. ¶ 11.)  The building passed each HUD inspection.  (Fleckner Aff. ¶ 11.)

Nevertheless, Plaintiffs' habitability and third-party beneficiary claims assert HASB failed to remedy several maintenance problems, which made their public housing units uninhabitable.  (Am. Compl. ¶¶ 6-9; L Smith Dep pp. 203-04; W Smith Dep pp. 234-35.)  The remainder of this section sets forth the undisputed facts related to each maintenance issue Plaintiffs rely on to support their habitability claims.

1.   Mr. Smith's Toilet

Mr. Smith relies on two toilet problems to support his claims.  First, Mr. Smith claims the chain in the toilet tank broke.  (W Smith Dep p. 145-46.)  However, as Mr. Smith acknowledges, the maintenance department replaced the broken chain when he reported the problem to HASB.  (W. Smith Dep p. 149.)  Second, the toilet broke again and caused a flood a day or two after Mr. Smith reported the problem to HASB's maintenance department.  (W Smith Dep. pp. 147-48, 150.)  Maintenance stopped the flooding and replaced the toilet the same day the flood occurred.  (W Smith Dep. pp. 151-52.)  Mr. Smith did not experience any other problems with his toilet after HASB replaced it.  (W Smith Dep. p. 152.)

2.   Pests

Mr. Smith claims his apartment and hallway were infested with roaches, and he had mice in his unit.  (W Smith Dep. pp. 159, 172.)  Mrs. Smith claims she had some roaches in her apartment, but claims her "biggest problem" was mice and bed bugs.  (L Smith Dep. p. 348.)

Throughout Plaintiffs' tenancy, HASB contracted with a pest control provider to ensure industry-leading treatment of roaches, bedbugs, mice and other pests.  (Fleckner Aff. ¶ 14.) Until a few months before Plaintiffs moved out of 628 Western in August 2009, pest control treatment was tenant-driven, meaning HASB dispatched its contractors to treat units and buildings in response to tenant complaints about pests.[6]  (Fleckner Aff. ¶ 16.)  HASB informed Plaintiffs of this complaint process.  (Fleckner Aff. ¶ 14.)  Plaintiffs complained to HASB about pests, and their units were treated in response to their complaints.  (L Smith Dep. pp. 98, 106-07; W Smith Dep. pp. 164-65.)  HASB pest control contractors prepared and maintained records memorializing the pest control treatment provided in response to each tenant pest complaint, including all of Plaintiffs' complaints.  (Fleckner Aff. ¶¶ 17-20; Pest Control Records (**Ex. J**).)

Pest control records from Plaintiffs' units show neither unit had a significant or frequent pest problem and establish HASB took prompt and appropriate action to exterminate the pests when Plaintiffs complained.  (Pest Control Records; Fleckner Aff. ¶¶ 20-21.)  Indeed, Mr. Smith only complained about pests five times during his three and a half year residency in apartment 416.  (Pest Control Records; Fleckner Aff. ¶ 20.)  Specifically, HASB pest control contractors inspected and treated Mr. Smith's unit on December 8, 2004, February 8, 2005, February 15, 2006, May 24, 2006, and July 19, 2007.  (*Id.*.)  The contractors found no roaches in Mr. Smith's unit on May 24, 2006 or July 19, 2007.  (*Id.*)

---

[6] Starting in approximately August 2009 (just before Plaintiffs moved out of public housing), HASB implemented a mandatory quarterly pest control program at 628 Western.  (Fleckner Add. ¶16.)

Likewise, Mrs. Smith only complained four times about pests.  (Pest Control Records; Fleckner Aff. ¶ 21.)   Specifically, a HASB contractor inspected and treated her unit for pests in 2004, 2006, 2007, and 2008.  (*Id*.)  The contractor found "few roaches" in 2004, 2006, and 2007, and the contractor found *no* roaches in 2008.  (*Id.*)  Nevertheless, during each of those visits, the contractor "baited" the unit.[7]  (*Id.*)  On February 11, 2009, a HASB contractor inspected Mrs. Smith's unit and found insect infestation in her unit.  (February 11, 2009 Inspection Report (**Ex. K**); Fleckner Aff. ¶ 22.)  HASB's contractor treated her unit the following day.  (Pest Records; Fleckner Aff. ¶ 22.)  The HASB contractor inspected and treated Mrs. Smith's for pests (roaches and bed bugs) again on June 11, 2009 and June 18, 2009.  (*Id.*)  The contractor found few or no roaches during these June 2009 inspections, but found bedbugs for the first time in Mrs. Smith's unit.  (*Id*.)  In fact, HASB was not aware any 628 Western tenant had bedbug problems until 2009.  (Fleckner Aff. ¶ 23.)  Upon learning of the bedbug concern, HASB's Manager of Maintenance, David Fleckner, researched the proper treatment of bedbugs in a multi-family residence like 628 Western and worked with HASB's pest control contractor for proper extermination.  (Fleckner Aff. ¶ 23.)  The treatment was later reviewed and approved by the Indiana Department of Health.  (Fleckner Aff. ¶ 23.)  Mrs. Smith's apartment was treated once more for bedbugs and roaches on August 6, 2009, and for roaches on August 13, 2009.  Plaintiffs moved out on August 31, 2009.  (Pest Records; Fleckner Aff. ¶ 23.)

With regard to mice, Mrs. Smith claims she contacted HUD about this problem and a HUD employee and Mr. Lottie, Assistant Manager of Public Housing, responded by inspecting her unit.  (L Smith Dep. pp. 102-03.)  After this inspection, Mrs. Smith acknowledges HASB treated her unit "almost right away," and she no longer saw mice.  (L Smith Dep. pp. 106-07.)

---

[7] "Bait" refers to a paste or gel that is applied to baseboards, behind furniture, under cabinets, and other out-of-reach places.  (Fleckner Aff. ¶ 25.)  The bait kills roaches on ingestion, and provides a long term solution—it works for up to six months.  (*Id*.)  Bait is the seminal product to exterminate roaches and other pests.  (*Id.*)

### 3. Mr. Smith's Air Conditioner

Mr. Smith alleges his air conditioner did not work because of a faulty filter. (W Smith Dep. pp. 172-73.) But, during his deposition, Mr. Smith admitted HASB's maintenance department changed his air conditioner's filter and fixed his air conditioner within a day or two after he called HASB to report the problem. (W Smith Dep. pp. 173-74, 177.)

### 4. Elevators in 628 Western

Plaintiffs alleges the 628 Western elevators "were broken and did not function for several weeks at a time," which forced Mr. Smith to walk up the stairs with his bicycle. (Am. Compl. ¶ 7.) But, Plaintiffs can recall only one occasion when both elevators were broken at the same time. (W Smith Dep. pp. 180-81; L Smith Dep. p. 145.) And, neither Mr. nor Mrs. Smith complained to HASB about the elevators being broken. (W Smith Dep. p. 182; L Smith Dep. p. 144.) Moreover, HASB has a full-service contract with Schindler Elevator Corporation to repair and maintain 628 Western's two elevators. (Fleckner Aff. ¶ 26; Affidavit of Gerald Cunningham (**Ex. L**) ¶¶ 3, 4; Schindler Elevator Records for 628 Western (**Ex. M**).) The HASB contacts Schindler whenever it receives notice of elevator malfunction at 628 Western, and Schindler dispatches a field technician to fix the problem. (Fleckner Aff. ¶ 27; Cunninham Aff. ¶ 6). Schindler usually fixes any elevator malfunctions within a couple of hours of getting a call from HASB. (Fleckner Aff. ¶ 27) Indeed, the 628 Western elevators were never both unusable for a day, let alone weeks as alleged in the Amended Complaint. (Schindler Elevator Records; Fleckner Aff. ¶ 27.) No residents of 628 Western ever complained to HASB that they were unable to reach their destination because of inoperable elevators. (Fleckner Aff. ¶ 28.)

### 5. Mrs. Smith's Carpet

Mrs. Smith alleges "HASB failed to clean her carpet, which was filthy upon her moving in. She made a report and repeated demands on HASB to clean the carpet." (Am. Compl. ¶

8(a).)  But, it is undisputed that HASB installed new carpet in Mrs. Smith's unit before she moved into the unit.  (L Smith Dep. pp. 77-79, Dep. Ex. 6.)

On August 10, 2008, Mrs. Smith's carpet got wet after a sprinkler head broke in her neighbor's unit.  (L Smith Dep. p. 161; Am. Compl. ¶ 9(a); Fleckner Aff. ¶ 30.)  A HASB contractor attempted to remove the water from the carpet to preserve it, but then decided to install new carpeting.  (Fleckner Aff. ¶ 30.)  The new carpeting was installed in Mrs. Smith's unit on August 21, 2008, eleven days after the flood. (L Smith Dep. pp. 158-59, 166, 194; Fleckner Aff. ¶ 30; August 21, 2008 Work Order (**Ex. N**).) Mrs. Smith had no further concerns after the carpet was replaced.  (L Smith Dep. p. 174.)

6.     Mrs. Smith's Possible Mold Concerns

Plaintiffs' habitability claims are also based on two possible mold issues.[8]  (L Smith Dep. pp. 175-77).  First, Mrs. Smith became concerned mold was growing under her carpet and on her bathroom tile after the April 10, 2008 flood.  (L Smith Dep. pp. 170-72.)  She reported these concerns to her Housing Specialist, Kathy Mammolenti.  (L Smith Dep. pp. 170-71.) Mammolenti and another HASB employee inspected her apartment, but found no mold.  (L. Smith Dep pp. 170-71, 175-76.)  Moreover, Mrs. Smith was able to clean the suspected "mold" spot on her bathroom tile, and the new carpeting, which was installed eleven days after the flood (Fleckner Aff. ¶ 30; August 21, 2008 Work Order), remedied any remaining concerns she had about mold from the flood.  (L Smith Dep. pp. 174, 176.)  Mrs. Smith's second possible mold concern related to a black spot on the pipe underneath her kitchen sink.  (L Smith Dep. 177-78.) However, Mrs. Smith admits HASB replaced the problem pipe after she complained about the issue and she had no further problems with possible mold on it.  (L Smith Dep pp. 178-79.)

---

[8] Mrs. Smith alleges in her First Amended Complaint that the mold had an "overpowering smell."  (Am. Compl. ¶ 8(b).)  But, at her deposition, Mrs. Smith denied that the mold had any smell.  (L Smith Dep. p. 177.)

7.      Stoppage in Building Disposal Systems

Mrs. Smith claims the odor from a stoppage in the building's disposal systems made her home uninhabitable.  (L Smith Dep. pp. 193-95; Am. Compl. ¶ 9(b).)  Mrs. Smith, however, never reported this problem to HASB.  (L Smith Dep. p. 195.)  Moreover, according to Mrs. Smith, she successfully blocked the smell from entering her unit with a door stopper, and HASB remedied the problem by welding the trash chute shut.  (L Smith Dep. pp. 360-61.)

8.      Removal of Dead Body

Mrs. Smith claims a resident died in the building and his body caused a smell.  (L Smith Dep. p. 187; Am. Compl. ¶ 9(a).)  HASB has no knowledge of this incident, and Mrs. Smith admits "no one knew" the man died.  (L Smith Dep. pp. 187-89; Fleckner Aff. ¶ ; Mammolenti Aff. ¶ 21.)  Moreover, Mrs. Smith testified that once the issue came to light, someone in white plastic clothes and masks removed the body, and the smell went away.  (*Id.*)

9.      Electrical and Exposed Wires

Plaintiff's Amended Complaint referenced problems with electrical and exposed wires in 628 Western, but Plaintiffs' testimony reveals they had no concerns about electrical issues in their units or building.  (W. Smith's Dep. pp. 200-01; L Smith Dep. pp. 196-97, 201.)

10.     Cleanliness of Common Areas

Contrary to Plaintiffs' Amended Complaint, Plaintiffs do not allege HASB failed to keep the common areas of 628 Western clean.  (W Smith Dep. pp. 201-02; L Smith Dep. pp. 202-03; Am. Compl. ¶ 9(e).)  To the contrary, Mr. Smith admits HASB "tried to keep [the common areas] clean;" he seldom saw them dirty; and he did not complain to HASB about common area uncleanliness.  (W Smith Dep. pp. 201-02, 328-30.)

11.   Shine to Mrs. Smith's Floor

In addition to the allegations in the Amended Complaint, Mrs. Smith claims HASB failed to provide her with a habitable premises because her kitchen floor was 40 years old and chipping, and neither the kitchen nor bathroom floors "shine[d]."  (L Smith Dep. pp. 399-400, 436.)  But, it is undisputed that HASB stripped and shined Mrs. Smith's floors on August 21, 2007, less than two weeks after she complained about this issue.  (L Smith Dep. pp. 436-37; August 21, 2007 Work Order (**Ex. O**); Fleckner Aff. ¶ 33.)  Mrs. Smith never complained again about her floors after HASB stripped and shined them.  (L Smith Dep. p. 437.)

**D.     Procedural History and Plaintiffs' Remaining Claims**

Plaintiffs filed their Complaint initiating this lawsuit on July 23, 2009.  [Dkt. No. 1.] That Complaint alleged fifteen claims against ten defendants, including the HASB, its former Executive Director Marva Leonard-Dent, the HASB Board of Commissioners, and individual Commissioners.  (*Id.*)  The Court dismissed with prejudice all claims against Ms. Leonard-Dent, the HASB Board, and the Commissioners, and the Court dismissed without prejudice all claims against HASB.  [Dkt. No. 37.]

On November 15, 2010, Plaintiffs filed an Amended Complaint, in which they only named HASB as a Defendant, and they whittled their claims down to eight.  [Dkt. No. 40.] HASB filed a Motion to Dismiss all of Plaintiffs' claims.  [Dkt. No. 43.]  The Court granted the Motion as to some claims, but denied it as to others.  Specifically, the Court dismissed Plaintiffs' claims of tenant-on-tenant bullying, segregation and race discrimination under the equal protection clause of the United States Constitution, race discrimination in violation of Title VI of the Civil Rights Act, and violations of due process under the federal and state constitutions. [Dkt. No. 56.]  The Court denied the Motion to Dismiss as to Plaintiffs' disability discrimination claims under the FHA, ADA, and Section 504 of the Rehabilitation Act; habitability claim based

14

on Indiana Code § 32-31-8-5, -6; and their third-party beneficiary claim based on 24 C.F.R. § 966.4. [Dkt. No. 56.]

However, Mr. Smith has since denied having a disability discrimination claim. Indeed, Mr. Smith does not believe anyone at the Housing Authority treated him unfairly or differently because of any kind of health condition. (W Smith Dep. pp. 137-38.) In fact, Mr. Smith does not even believe he has a disability. (W Smith Dep. p. 137.) Mr. Smith testified "I don't have no – what kind of health condition? A normal illness, what normal people my age would have. I don't have no health conditions, really." (W Smith Dep. p. 137). Mr. Smith's attorney suggested Mr. Smith's disability discrimination claim is based on Mr. Smith being evicted while he was hospitalized, but Plaintiffs rejected this theory as well. (W Smith Dep. pp. 136-37, 323-24; L Smith Dep. p. 276.) Indeed, Mr. Smith testified that he has no reason to believe the Housing Authority evicted him because of his hospitalization. (W Smith Dep. p. 323.)

## III.   ARGUMENT

### A.   Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(c), motions for summary judgment "shall be rendered forthwith if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c) (emphasis added). Since the Supreme Court's ruling in *Celotex Corp. v. Catrett*, summary judgment is mandatory when this standard is met. 477 U.S. 317, 322 (1986). "A scintilla of evidence in support of the non-moving party's position is not sufficient to successfully oppose summary judgment; 'there must be evidence on which the jury could reasonably find for plaintiff.'" *Large v. Mobile Tool Int'l*, 2009 WL 1564415, *3 (N.D. Ind. June 3, 2009) (*quoting Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250 (1986) (other citations omitted).

**B.    Plaintiffs' FHA, ADA and Rehabilitation Act Claims Lack Merit**

All of Plaintiffs' FHA, ADA and Rehabilitation Act claims fail because Mr. Smith is not disabled and therefore neither he nor his wife by association with him are entitled to protections under these statues.  Their claims under these statutes also fail because they cannot satisfy the elements of their claims.

1.    Mr. Smith Is Not Disabled

A plaintiff must establish he is disabled as a threshold to succeed with claims under the FHA, the ADA, the Rehabilitation Act. *See A.B. ex rel. Kehoe v. Hous. Auth. of S. Bend*, 2012 WL 1877740, *4 (N.D. Ind. 2012); *see also Povey v. City of Jeffersonville, Ind.*, 697 F.3d 619, 624 (7th Cir. 2012) ("Without evidence that Povey is disabled, Povey cannot survive summary judgment on her disparate treatment and failure to accommodate claims under the ADA."); *Brad K. v. Bd. of Educ. of City of Chicago*, 787 F. Supp. 2d 734, 746 (N.D. Ill. 2011) (explaining the elements of plaintiff's ADA accessibility claim, including that the plaintiff have a qualifying disability); *Lee v. A & W Pritchard Enterprises, Inc.*, 2009 WL 3484068 (W.D. Ky. 2009) (dismissing the plaintiff's FHA claims, including an accessibility claim, because the plaintiff failed to allege she was disabled).  Likewise, Mrs. Smith must establish Mr. Smith is disabled in order to sustain her associational discrimination claim.  *Larimer v. Int'l Bus. Machines, Corp. ex rel. Lotus Dev. Corp.*, 2003 WL 1989649 (N.D. Ill. 2003).

But here, Mr. Smith insists he is not disabled, and his eviction had nothing to do with his hospitalization.  Even if Mr. Smith relied on his hospitalization to support his disability discrimination claims, he made a full recovery within a month, and temporary medical conditions, with little or no long term or permanent impact, are not disabilities. *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002); *Serednyj v. Beverly Healthcare,*

*LLC,* 656 F.3d 540, 554 (7th Cir. 2011) (*citing* 29 C.F.R. 1630, App. § 1630.2(j)).[9]  Because Mr. Smith is not disabled, he and his wife are not protected by the FHA, ADA or the Rehabilitation Act, and their claims under these statues fail as a matter of law.

> 2.   Mr. Smith's Disparate Treatment Discrimination Claim Fails For Other Reasons

Mr. Smith testified that he is *not* asserting a disparate treatment disability discrimination claim – at all.  Even if Mr. Smith asserted such a claim and could establish he was disabled, his claim would fail because HASB had no knowledge of Mr. Smith's alleged disability during his public housing tenancy or before deciding to evict him.  For example, Mr. Smith was not hospitalized and did not have a bowel impairment until *after* HASB issued its lease termination notice and filed an immediate possession action.  Therefore, HASB could not have taken any action against Mr. Smith during his tenancy, including seeking immediate possession, because of his hospitalization or bowel impairment.  *See Hedberg v. Indiana Bell Tel. Co., Inc.*, 47 F.3d 928, 932 (7th Cir. 1995) (explaining that there can be no liability under the ADA for disability discrimination if there was no knowledge of the disability).

Moreover, Mr. Smith presents no evidence of intentional discrimination.  *See Basith v. Cook Cnty.*, 241 F.3d 919, 927 (7th Cir. 2001) (ADA requires intentional discrimination); *see Bloch v. Frischholz*, 587 F.3d 771, 784 (7th Cir. 2009) (FHA requires intentional discrimination); *Sandlin v. Switzerland Cmty. Sch. Corp.*, 2009 WL 253470 (S.D. Ind. 2009) (Rehabilitation Act and ADA - same).  Indeed Mr. Smith "can't say" and does not know whether

---

[9] The ADA Amendments Act of 2008 ("ADAAA"), which became effective January 1, 2009, broadened the definition of "disability."  Pub.L. No. 110-325, 122 Stat. 3553 (2008).  Nevertheless, the ADAAA definition of "disability" does not apply here because the events at issue in this case, including Mr. Smith's public housing tenancy and his eviction, occurred before January 1, 2009, and the ADAAA does not apply retroactively. *Fredricksen v. United Parcel Serv., Co.*, 581 F.3d 516, 521 n.1 (7th Cir. 2009).  Thus, the pre-ADAAA definition of "disability" found in *Toyota* and *Serednyj* govern this case.

HASB treated individuals with disabilities unfairly.  (W Smith Dep. p. 323.)  He also "can't say" whether HASB evicted him because of his hospitalization.  (W Smith Dep. p. 323.)

Mr. Smith claims Ms. Mammolenti treated Mr. Steward better.  Even if this allegation was true (which it is not), it does not support Mr. Smith's disability discrimination claim.  Indeed, Mr. Steward receives Social Security Disability Insurance benefits and as such is disabled.  In other words, Mr. Steward is not outside of Mr. Smith's alleged protected class and preferential treatment of Mr. Steward does not suggest a discriminatory animus.  Even so, HASB did not treat Mr. Steward more favorably and he is not similarly situated.  His misconduct was not ignored.  In fact, HASB issued Mr. Steward a Notice of Good Cause to Terminate Lease on November 13, 2006 for playing his guitar too loud, and HASB is unaware of any other lease violations by Mr. Stewart.

In short, Mr. Smith offers no evidence of disability discrimination.  Therefore, he cannot establish a *prima facie* case of discrimination or rebut HASB's legitimate reasons for evicting him, *i.e.,* Mr. Smith's disorderly conduct and disturbing the peaceful enjoyment of other tenants amounted to repeated lease violations warranting his eviction.

Perhaps recognizing this, Mr. Smith offers an alternative theory for his eviction having nothing to do with his disability, *i.e.,* he claims HASB evicted him because he complained about Mr. Steward's disorderly conduct.  This theory fails for several reasons.

First, Mr. Smith cannot base a disparate treatment claim on his eviction because the *Rooker-Feldman* doctrine deprives this Court of subject matter jurisdiction over a wrongful eviction claim (whether based on retaliation or discrimination).  Under the *Rooker-Feldman* doctrine, lower federal courts do not have subject matter jurisdiction over claims seeking review of state court judgments.  *See Rooker v. Fidelity Trust Co*., 263 U.S. 413, 415-16 (1923); *District*

*Court of Appeals v. Feldman*, 460 U.S. 462, 482-86 (1983).  The doctrine applies not only to claims that were actually raised before the state court, but also to claims that are inextricably intertwined with state court determinations.  *See Feldman*, 960 U.S. at 482 n. 16 ("By failing to raise his claims in state court a plaintiff may forfeit his right to obtain review of the state-court decision in any federal court"); *Olejnik v. St. Joseph County Sheriff*, 2007 WL 4256246 at * 1 (N.D. Ind. 2007) (same).  To determine whether federal claims fall within the doctrine's ambit, the Court must determine whether the injury alleged by the federal plaintiff arose from the state court judgment or whether it is independent from that judgment.  *See Garry v. Geils*, 82 F.3d 1362, 1365 (7th Cir. 1996); *Olejnik*, 2007 WL 4256246 at *1.

The *Rooker-Feldman* doctrine applies to Mr. Smith's disparate treatment claim. Mr. Smith claims HASB issued the May 16, 2008 Notice, which served as the basis for the eviction, because of his complaints about Steward.  Mr. Smith claims he wanted to keep his own apartment separate from Mrs. Smith, even after they got married.  (L Smith Dep p. 235-36; W Smith Dep p. 124-25, 331.)  In other words, the gravamen of Mr. Smith's disparate treatment claim is that HASB wrongfully pursued eviction proceedings against him and that, as a result of the eviction, he suffered damages.  Therefore, this claim is inextricably intertwined with the state court decision because Mr. Smith would not have suffered any alleged injury in the absence of the eviction.  *See, e.g., Holt v. Lake County Bd. of Comm'n*, 408 F.3d 335, 336 (7th Cir. 2005) (*Rooker-Feldman* applied because the injury plaintiff alleged in his §1983 denial of due process claim was caused by the state court judgments upholding a tax sale and evicting him from his property); *Garry*, 82 F.3d at 1368 (Rooker-Feldman applied because "the injury alleged was only complete when the state court actually condemned the property").

Even if the *Rooker-Feldman* doctrine does not apply or to the extent Mr. Smith's disparate treatment retaliation claim is based on some other alleged adverse action, Mr. Smith's claim fails because he never engaged in protected activity.  Indeed, Mr. Smith complained about Mr. Steward making noise and engaging in other misconduct, not about disability discrimination, therefore, such a complaint is not protected by the FHA, ADA or Rehabilitation Act.  *See Small v. WW Lodging, Inc.,* 106 F. App'x 505, 508 (7th Cir. 2004) (explaining protected activity must oppose practice prohibited by discrimination law); *Dean v. Jones*, 2010 WL 1873089 (D. Or. Mar. 2, 2010) (plaintiff tenant failed to state a claim for retaliation under the FHA because he did not allege membership in a protected class, or that the defendant's actions were based on the tenant's protected status).  Moreover, Mr. Smith's purported retaliation claim fails because he has no evidence suggesting HASB intentionally retaliated against him.  Indeed, he cannot establish a *prima facie* case of retaliation because he was not treated less favorably than similarly situated tenants or rebut the HASB's legitimate reasons for evicting him.

### C.     Mrs. Smith's Disparate Treatment Claims Fail

Mrs. Smith alleges HASB's initial denial of her Section 8 Program application and Mr. Smith's eviction were discriminatory or retaliatory under the FHA, ADA, and Rehabilitation Act.  Specifically, Mrs. Smith claims HASB's actions were based on her association with Mr. Smith, who she alleges has a disability, or in retaliation for her complaints about associational discrimination.

Mrs. Smith's associational disability discrimination claim fails for the same threshold reason Mr. Smith's disability discrimination claim fails, *i.e.*, Mr. Smith was not disabled. Likewise, any claim asserted by Mrs. Smith based on Mr. Smith's eviction fails for the same reasons Mr. Smith's eviction-based claim fails.

20

Mrs. Smith's disparate treatment claims also fail for several other reasons.  For example, Mrs. Smith did not suffer an injury as a result of the alleged discrimination or adverse action because of the alleged retaliation; therefore, she cannot sustain an associational discrimination or retaliation claim.  *Schneider v. Cnty. of Will, State of Illinois*, 190 F.Supp.2d 1082, 1091-92 (N.D. Ill. 2002) (elements of associational discrimination); *Casna v. City of Loves Park*, 574 F.3d 420, 427 (7th Cir. 2009) (elements of ADA retaliation); *Fincher v. South Bend Housing Authority*, 612 F.Supp.2d 1009 (N.D. Ind. 2009) (FHA retaliation elements); *Burks v. Wisconsin Dep't of Transp.*, 464 F.3d 744, 759 (7th Cir. 2006) (Rehabilitation Act retaliation elements).  Indeed, it is undisputed that HASB approved Mrs. Smith's Section 8 Program application and she obtained Section 8 housing.  Moreover, Mr. Smith was evicted, not Mrs. Smith.  She was not denied housing and cannot show she suffered injury personally because of Mr. Smith's eviction.  *See Minority Police Officers Ass'n of S. Bend v. City of S. Bend, Ind.*, 555 F. Supp. 921, 929 (N.D. Ind. 1983) (granting summary judgment to employer for lack of standing on claims brought by current employees who had not suffered the injury; they were attempting to assert the legal rights of third parties who were denied employment).

In addition, to sustain her associational discrimination claim, Mrs. Smith must demonstrate that Mr. Smith's disability was a "determining factor" in HASB's actions against her.  *Magnus v. St. Mark United Methodist Church*, 688 F.3d 331, 337 (7th Cir. 2012) (plaintiff bringing associational disability discrimination claim could not overcome proffered legitimate nondiscriminatory reasons for actions).  Likewise, she must establish a causal connection to sustain her retaliation claim.  *Casna*, 574 F.3d at 427; *Burks*, 464 F.3d at 759.

But, she cannot meet these elements because the evidence establishes HASB had legitimate reasons for its actions.  For example, HASB denied Mrs. Smith's Section 8 application

based on HASB's criminal background search and its consistently enforced policy of denying Section 8 applications when the applicant or household members engage in certain criminal activity.   There is no evidence HASB processed Mrs. Smith's Section 8 application or administered her Section 8 benefits any differently than it did for other Section 8 applicants and beneficiaries.   Moreover, as discussed above, HASB had legitimate reasons for evicting Mr. Smith.  And, with regard to her retaliation claim, it is undisputed that any complaint to Brownlee about associational discrimination took place in July 2009, *after* Mr. Smith's eviction, *after* Mrs. Smith had been temporarily been declared ineligible for Section 8, and *after* her Section 8 voucher was granted.   Therefore, Mrs. Smith's alleged complaint could *not* have been the impetus for any of the alleged adverse actions.

### D.    Plaintiffs' Habitability Claim Fails

Plaintiffs' habitability claim is based on alleged violations of Indiana Code Section 32-31-8-5 and 32-31-8-6.  The law states a landlord shall:

> (1) Deliver the rental premises to a tenant in compliance with the rental agreement, and in a safe, clean, and habitable condition.
>
> (2) Comply with all health and housing codes applicable to the rental premises.
>
> (3) Make all reasonable efforts to keep common areas of a rental premises in a clean and proper condition.
>
> (4) Provide and maintain the following items in a rental premises in good and safe working condition, if provided on the premises at the time the rental agreement is entered into:
>
> > (A) Electrical systems.
> >
> > (B) Plumbing systems sufficient to accommodate a reasonable supply of hot and cold running water at all times.
> >
> > (C) Sanitary systems.

> (D) Heating, ventilating, and air conditioning systems. A heating system must be sufficient to adequately supply heat at all times.
>
> (E) Elevators, if provided.
>
> (F) Appliances supplied as an inducement to the rental agreement.

To succeed in asserting a claim based on violation of these obligations, Plaintiffs must establish: (1) they notified HASB of the violation; (2) they gave HASB a reasonable amount of time to make repairs; and (3) HASB failed or refused to repair or remedy the condition Plaintiffs complained about.  Ind. Code. 32-31-8-6(b)(1)-(3).  None of Plaintiffs' alleged violations meet these three elements.  To the contrary, the evidence establishes HASB provided prompt and adequate maintenance in response to Plaintiffs' maintenance issues.  Indeed, Plaintiffs admit that two of their 11 habitability allegations were not really problems (*i.e.*, electrical and cleanliness of common areas), and they admit they never complained about the alleged elevator issues.  Moreover, Plaintiffs admit that HASB resolved seven of their habitability problems after they complained (*i.e.*, problems relating to Mr. Smith's toilet and air conditioner, and Mrs. Smith's concerns about her carpet, mold, disposal system, smell from dead body, and shine to her floors).  Moreover, Plaintiffs admit (and records show) that HASB responded to their pest complaints by having its contractor inspect and treat their apartments, and the records establish those treatments were successful and neither unit had a significant pest problem.

Plaintiffs have not presented evidence of even one occasion when HASB failed or refused to remedy an alleged violation of which it was made aware.  Therefore, the undisputed facts demonstrate Plaintiffs' habitability claim warrants summary judgment.

### E.      Plaintiffs' Third Party Beneficiary Claim Fails

Plaintiffs' third party beneficiary claim is based on violation of federal regulation 24 C.F.R. § 966.4.  [Dkt 56, p. 38].  Subsection (e) of this regulation requires that HASB leases incorporate the following HASB obligations:

> (1) To maintain the dwelling unit and the project in decent, safe, and sanitary condition;

> (2) To comply with requirements of applicable building codes, housing codes, and HUD regulations materially affecting health and safety;

> (3) To make necessary repairs to the dwelling unit;

> (4) To keep project buildings, facilities, and common areas, not otherwise assigned to the tenant for maintenance and upkeep, in a clean and safe condition;

> (5) To maintain in good and safe working order and condition electrical, plumbing, sanitary, heating, ventilating, and other facilities and appliances, including elevators, supplied or required to be supplied by the PHA;

> (6) To provide and maintain appropriate receptacles and facilities (except containers for the exclusive use of an individual tenant family) for the deposit of ashes, garbage, rubbish, and other waste removed from the dwelling unit by the tenant in accordance with paragraph (f)(7) of this section;

> (7) To supply running water and reasonable amounts of hot water and reasonable amounts of heat at appropriate times of the year (according to local custom and usage), except where the building that includes the dwelling unit is not required by law to be equipped for that purpose, or where heat or hot water is generated by an installation within the exclusive control of the tenant and supplied by a direct utility connection.

HASB's leases with Plaintiffs incorporate the above language as required by Section 966.4(e).  Moreover, the undisputed facts demonstrate HASB has *not* breached its obligations as to the substance of the requirements, but regardless, Plaintiffs have suffered no damages.  *Price v. Pierce*, 823 F.2d at 1120 (while federal law governs the issue of third party beneficiary status,

state law may be applied in determining whether a breach occurred); *Indiana Bureau of Motor Vehicles v. Ash, Inc*., 895 N.E.2d 359 (Ind. App. 2008) (listing elements of a breach of contract as "the existence of a contract, the defendant's breach thereof, and damages.")  Plaintiffs have failed to sustain their burden of establishing HASB breached the lease.  *Brown v. Guinn*, 970 N.E.2d 192, 196 (Ind. App. 2012).   Indeed throughout Plaintiffs' tenancies, the building Plaintiffs lived in passed every HUD physical standard inspection—these standards are founded on HUD's requirement that HUD housing be decent, safe, sanitary and in good repair.  Further, maintenance and pest control records, as well as Plaintiffs own testimony demonstrate HASB made necessary repairs, kept the common areas clean, adequately maintained electrical, plumbing, elevator and other services supplied by HASB, and provided and maintained disposal systems.  The undisputed facts demonstrate HASB fulfilled its obligations under the lease.

Regardless, however, Plaintiffs cannot demonstrate they suffered any damages because of any of HASB's actions.  Plaintiffs' seek compensatory and punitive damages.  (L Smith Dep. p. 404-05; W Smith Dep. p. 320-21.)  Neither type of damage are generally recoverable for breach of contract in Indiana.   *Dahlin v. Amoco Oil Corp*., 567 N.E.2d 806, 810 (Ind. Ct. App. 1991); *Tacket v. Gen. Motors Corp., Delco Remy Div*., 830 F. Supp. 468, 470 (S.D. Ind. 1993) (dismissing breach of contract claim because it sought compensatory emotional distress damages).  Because Plaintiffs cannot establish a breach of HASB's obligations and cannot recover for the damages sought, Plaintiffs' third party beneficiary claim warrants dismissal.

IV.   **CONCLUSION**

For these reasons, the Housing Authority respectfully requests that the Court grant summary judgment in favor of HASB on all of Plaintiffs' claims and grant HASB all other appropriate relief.

Respectfully submitted,
BARNES & THORNBURG LLP

/s/ Michael P. Palmer
Michael P. Palmer
Kyra E Clark
700 1st Source Bank Center
100 North Michigan St.
South Bend, IN  46601-1632
Telephone:  (574) 237-1135 (MP)
Telephone:  (574)237-1249 (KC)
Facsimile:  (574) 237-1125
Michael.palmer@btlaw.com
Kyra.clark@btlaw.com

ATTORNEYS FOR DEFENDANT

## CERTIFICATE OF SERVICE

I hereby certify that on December 20, 2013, I electronically filed the above and foregoing

with the Clerk of the Court using the ECF system which sent notification of such filing to:  Kent

Hull, Esq., Indiana Legal Services, Inc., The Commerce Center, 401 E. Colfax Ave., Suite 116,

South Bend, IN 46617-2885

/s/ Michael P. Palmer