# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF INDIANA
### SOUTH BEND DIVISION

WILLIAM SMITH AND )
LUBIRTA SMITH )
)
PlaintiffS, )
)
vs. )   CAUSE NO. 3:09-CV-330
)
HOUSING AUTHORITY OF )
SOUTH BEND, )
)
Defendant. )

## OPINION AND ORDER

This matter is before the Court on the: (1) Motion for Summary Judgment, filed by the Defendant, the Housing Authority of South Bend, on December 20, 2013 (DE #91); (2) Plaintiffs' Cross-Motion for Partial Summary Judgment, filed by the Plaintiffs, William and Lubirta Smith, on May 12, 2014 (DE #105); and (3) Defendant's Motion to Strike Evidence Designated by Plaintiffs, filed by the Defendant, the Housing Authority of South Bend, on July 7, 2014 (DE #112). For the reasons set forth below, the Defendant's Motion for Summary Judgment (DE #91) is **GRANTED**, the Plaintiff's Cross-Motion for Partial Summary Judgment (DE #105) is **DENIED**, and the Defendant's Motion to Strike (DE #112) is **GRANTED**. The clerk is **DIRECTED** to close this case.

BACKGROUND

On July 23, 2009, the Plaintiffs, William Smith and Lubirta Smith (collectively, the "Smiths"), filed their Verified Complaint With Jury Demand. The original Complaint named numerous defendants including the Housing Authority of South Bend (the "HASB"). Motions to dismiss were filed by the various defendants, and on September 30, 2010, this Court issued an order granting those motions. However, the Court granted the Smiths leave to amend their Complaint to clarify their cause of action. On November 15, 2010, the Smiths timely filed an Amended Complaint, naming only the HASB as a defendant. In lieu of an answer, the HASB filed a motion to dismiss. On March 30, 2012, the Court granted in part and denied in part the motion to dismiss, dismissing various claims but concluding that the Smiths had alleged sufficient facts pertaining to Disability Based Fair Housing Act ("FHA"), Rehabilitation Act ("Rehab Act"), Americans with Disabilities Act ("ADA"), Habitability, and Third Party Beneficiary causes of action to proceed on those specific claims.

Discovery commenced and ultimately concluded on October 1, 2013. The HASB filed the instant motion for summary judgment on December 20, 2013. After several requests for an extension of time to respond were granted by this Court, the Smiths filed a motion to strike several of the HASB's supporting exhibits on March 4, 2014, in lieu of a response. The Smiths again asked for and were granted

an extension of time to file their actual response to the HASB's summary judgment motion within fourteen days of the Court's ruling on the motion to strike. The Court denied the Smiths' motion to strike on June 2, 2014. The Smiths filed their response to the HASB's motion for summary judgment on June 17, 2014. The HASB filed a reply in support of its motion for summary judgment on June 7, 2014. Before the Court ruled on the motion to strike, however, the Smiths filed the instant cross-motion for partial summary judgment on May 12, 2014. The HASB filed its response to that motion on June 9, 2014, and the Smiths filed their reply in support on June 25, 2014. Finally, on July 7, 2014, the HASB filed the instant motion to strike evidence designated by the Smiths. The Smiths filed their response to the HASB's motion to strike on July 28, 2014.[1] The HASB filed its reply on August 7, 2014. All motions have been fully briefed and are ripe for adjudication.

DISCUSSION

*Standard*

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

---

[1] The Smiths also filed several "supplements" to their response.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Not every dispute between the parties makes summary judgment inappropriate; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* In determining whether summary judgment is appropriate, the deciding court must construe all facts in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Ogden v. Atterholt*, 606 F.3d 355, 358 (7th Cir. 2010). "However, our favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture." *Fitzgerald v. Santoro*, 707 F.3d 725, 730 (7th Cir. 2013) (citing *Harper v. C.R. Eng., Inc.*, 687 F.3d 297, 306 (7th Cir. 2012)).

A party opposing a properly supported summary judgment motion may not rely on allegations or denials in her own pleading, but rather must "marshal and present the court with the evidence she contends will prove her case." *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). If the nonmoving party fails to establish the existence of an essential element on which he or she bears the burden of proof at trial, summary judgment is proper. *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006).

Throughout their various briefs, the Smiths repeatedly cite to *Modrowski v. Pigatto*, 712 F.3d 1166 (7th Cir. 2013), among other Supreme Court and Seventh Circuit cases, claiming that the HASB has

failed to adequately support its summary judgment motion by filing an insufficient "statement of uncontested material facts." They argue that *Modrowski* stands for the proposition that a summary judgment movant is required to show a "complete absence of evidence" supporting the nonmovant's position "before the burden shifts to the [nonmovant] to counter-designate material showing a dispute of fact." The Smiths' understanding of both the *Modrowski* case and their characterization of the HASB's brief are wrong. While the *Modrowski* case recognizes that the initial burden of production "to inform the district court why a trial is not necessary" lies with the movant, the requirements imposed on the moving party "are not onerous" when it is the nonmovant who "bears the ultimate burden of persuasion on a particular issue." *Modrowski*, 712 F.3d at 1168. A party may move for summary judgment based on either "affirmative evidence that negates an essential element of the nonmoving party's claim" *or* by the other approach of "asserting that the nonmoving party's evidence [was] insufficient to establish an essential element of the nonmoving party's claim." *Id*. at 1169 (citation and internal quotation marks omitted). Both methods are acceptable under the current rules. *Id*.

The Smiths' attorney has displayed similar misunderstandings as to the law when he previously argued to the Seventh Circuit that this Court misapplied the summary judgment standard in a case which also involved the HASB as a defendant. See *Stevens v. Hous. Auth.*

*of South Bend*, 663 F.3d 300, 305 (7th Cir. 2011). The Seventh Circuit Court of Appeals described the plaintiff's argument as a "nonstarter" and stated:

> [The plaintiff] complains that [the defendant] was not put to the burden of showing the absence of a genuine issue of material fact. [The plaintiff] contends that [the defendant] failed to carry its burden when it did not foreclose the possibility that there were any disputes of material fact. This deficiency alone, according to [the plaintiff], required the district court to deny summary judgment. But the district court did not misstate or misapply the standards for summary judgment.
>
> . . . .
>
> Moreover, we rejected this very argument recently in *Crawford v. Countrywide Home Loans, Inc.*, 647 F.3d 642 (7th Cir. 2011). In that case, the plaintiff also claimed that . . . it was under no burden to produce evidence showing an issue of genuine fact unless the defendant wholly extinguishe[d] the possibility that the events forming the basis of his opponent's claims occurred. We characterized this interpretation as a misapplication of [the law] that is flatly contradict[ed] by *Celotex.*

*Id.* (internal citations and quotations marks omitted). As was the case in *Stevens*, this Court finds that the HASB's motion for summary judgment has comprehensively challenged the factual and legal support for the Smiths' claims.[2] Thus, the burden has shifted to the Smiths to cite to specific evidence in the record

---

[2] In their summary judgment brief, the HASB designates numerous pages of evidence with clear and specific citations to the record as its "statement of uncontested material facts." (See DE#93, pp. 3-14.)

that demonstrates that genuine disputes remain for trial. Nothing in any of the recent cases (including *Modrowski*) cited by the Smiths changes this analysis of the law or finding of fact.

*Preliminary Evidentiary Issues*

The HASB has filed the instant motion to strike portions of the Smiths' deposition testimony, portions of the alleged "Verification of Allegations in First Amended Complaint" ("Verification") as cited in support of the "Plaintiffs' Brief Opposing Motion for Summary Judgment by Defendant Housing Authority of South Bend" ("Response Brief"), and portions of the "Appendix with Statement of Genuine Disputes and Counter-Designated Testimony Supporting Plaintiffs' Brief Opposing Motion for Summary Judgment by Defendant Housing Authority of South Bend" ("Appendix").[3]

As to the Verification, related deposition testimony, and briefing citations, in a nutshell, the HASB argues that William Smith's deposition testimony, wherein he "verified" the verbatim allegations stated in the Amended Complaint after previously providing prior, much more specific and sufficiently detailed deposition testimony on each of those same subjects, should be stricken because it is conclusory and contradictory. The

_____

[3]  In a footnote in its reply brief, the HASB acknowledges that it inadvertently referenced Rule 56(e) as the basis of its motion rather than the correct reference to Rule 56(c) (as amended in 2010). Despite the Smiths' arguments to the contrary, the Court finds this mistake is not a sufficient basis for denying the motion. See Federal Rule of Civil Procedure 56(c) and Local Rule 56-1(e).

"verification" consists of the Smiths' attorney apparently presenting William Smith with a copy of the Amended Complaint on cross-examination, asking him to read the paragraphs one at a time, and then asking him to "verify" the truth of those paragraphs. (See W. Smith Dep. pp. 308-312 , DE #114-1, pp. 20-24.) The HASB points out that William Smith was later asked, on redirect examination, whether he wished to change any of the answers he had previously given during direct examination. (See W. Smith Dep. pp. 332-333, DE #114-1, pp. 27-28.) William Smith did not attempt to reconcile any of the conflicts or contradictions; he simply noted that he had answered the questions on direct examination truthfully and that there was nothing he would like to change. (*Id.* at 333, *Id.* at p. 28.) The Smiths respond by stating that their Verification is considered proper evidence in opposition to the motion for summary judgment and that finding otherwise would require the Court to weigh the evidence and make improper credibility determinations.[4] The Smiths then simply re-allege the evidence provided by the Verification portion of their Appendix but do not include any citations to the record other than a general reference to the entire Appendix. (See DE #118, pp.7-13 (citing generally to DE #110-1.)) The Court notes that the Appendix itself *only* directly cites to "pages 306 and 307" of William Smith's

---

[4] The Smiths list several pages of "counter-designated" evidence that pertain to William Smith's alleged disability, but this evidence is not the subject of the HASB's motion to strike, so the Court need not address it or strike it in this context. (See DE #118, pp.5-6.)

deposition testimony to show that he made a Verification. (See DE #110-1, pp. 2-6.) However, page 306 of William Smith's deposition has not been included in the record at all as far as the Court can ascertain,[5] and page 307 simply references the beginning of a question asked by the Smiths' attorney, but no answer was provided by William Smith on that page.[6]

In a situation analogous to the one at hand, the Seventh Circuit, citing to the Eighth Circuit with approval, declared that:

> a party should not be allowed to create issues of credibility by contradicting his own earlier testimony. Otherwise, the very purpose of the summary judgment motion-to weed out unfounded claims, specious denials, and sham defenses-would be severely undercut. . . . That same analysis applies to the instant situation [wherein the court was called upon to determine the admissibility of affidavit testimony that contradicted earlier deposition testimony]. Were the conflict at issue between a deposition and an affidavit given by two separate individuals, then summary judgment would be inappropriate because the district court may not weigh conflicting evidence. The situation is quite different when a plaintiff has directly contradicted her own earlier statements, without explaining the contradiction or attempting to resolve the disparity.

*Babrocky v. Jewel Food Co.*, 773 F.2d 857, 861 (7th Cir. 1985) (quotation marks and internal citations omitted); *see also Johnson*

---

[5] It was not included as part of the "Counter-designated Testimony of Plaintiff William Smith from his Deposition" as part of the Smiths' Response Brief (see DE #110-4), and the Court cannot find page 306 in any other part of the record.

[6] The Court will address these and other similar deficiencies below.

*v. Nordstrom, Inc.*, 260 F.3d 727, 736 (7th Cir. 2001) (no abuse of discretion where district court struck portions of the plaintiff's own affidavit because it contradicted her prior deposition testimony); *Bank of Illinois v. Allied Signal Safety Restraint Systems*, 75 F.3d 1162, 1168-72 (7th Cir. 1996) (finding that district court properly disregarded deposition testimony that contradicted earlier clear affidavit statements and noting that this was not considered improper weighing of evidence). The Court finds the reasoning of these cases persuasive. The Smiths' argument that *Ford v. Wilson*, 90 F.3d 245, 246-47 (7th Cir. 1996) allows "verification" of a complaint to be used to defeat a motion for summary judgment is unavailing. In *Ford*, the court simply noted that the plaintiff's actual verified complaint could be designated as evidence in opposition to the defendant's affidavit. *Id*. at 246. However, it was not alleged that verified complaint contradicted any of plaintiff's prior sworn testimony. *Id*. Additionally, the court noted that it "[did] not mean to commend the practice. The federal rules envisage the submission of evidentiary material in response to a motion for summary judgment as a means of sharpening the issues, so that the judge can determine just what if anything must be tried." *Id*. at 247.

Here, the Court agrees with the HASB that William Smith's contradictory and conclusory "verification" of the exact language of the Amended Complaint during cross examination subsequent to

providing previous, specific and sufficiently detailed deposition testimony on the same matters is similar to the affidavits described in *Babrocky*. Therefore, the Court **GRANTS** the HASB's motion to strike as it pertains to those vague, conclusory, contradictory statements found within William Smith's "verification" deposition testimony (see W. Smith Dep. pp. 308-312, DE #114-1, pp. 20-24), Verification cited in support of the Response Brief (see citations to Verification found within DE #110, pp. 9-12), and Appendix (see Appendix, ¶¶ 1(a)-1[7](m), DE #110-1, pp. 2-6). This material is **STRICKEN**.

The HASB also moves to strike Paragraph 32 of the Appendix which is related to Lubirta Smith's deposition testimony regarding her alleged disability. (See DE #110-1, p. 11; see also L. Smith Dep., pp. 111-12, DE #110-2, pp. 50-51.) The HASB contends that such evidence is irrelevant to this lawsuit because the Smiths' First Amended Complaint only alleges discrimination claims based on her association with William Smith rather than her own alleged disability. (See Amend. Comp., ¶¶, 22-24, DE #40, pp. 6-10.) The Court agrees. See *Shanahan v. City of Chi.*, 82 F.3d 776, 781 (7th Cir. 1996) ("A plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment.") Furthermore, the HASB points out that Lubirta Smith

---

[7] The Court assumes the Smiths meant to title this section paragraph 4(a)-(m) rather than a duplicative 1(a)-(m).

testified that her disability discrimination claims are based on her association with William Smith. (L. Smith Dep., pp. 244, DE #92-7, p. 56.) Although the Smiths argue that this information is "relevant to show her vulnerability to conditions in the HASB property with resulting injuries to her," the Court agrees with the HASB that this evidence is not at issue in the instant motion for summary judgment, and it is thus **STRICKEN**.

Finally, as referenced above in footnote number six, the Court will not consider any materials that are not properly cited to and supported by the record. For example, the Smiths' Appendix cites to many pages of deposition testimony that are not attached with their "Counter-Designated Testimony of Plaintiff William Smith from his Deposition" (DE #110-4) or "Counter-Designated Testimony of Plaintiff Lubirta Smith from her Deposition" and not included elsewhere in the record as far as the Court can discern. (See e.g., DE # 110-1, pp. 2 (citing to W. Smith's Dep, p. 306), 6 (citing to W. Smith's Dep., p. 144), 7 (citing to W. Smith's Dep., p. 9), 8 (citing to L. Smith's Dep., pp. 135, 155, 297), 9 (citing to W. Smith's Dep., p. 275), 10 (citing to W. Smith's Dep., pp. 278, 282, 288-89, 297)). The Court need not "credit [a party's] version of the facts when the materials supporting those asserted facts are not part of the record." *Stevens*, 663 F.3d at 311. Nor is the Court required to hunt through the record to make a party's case for him. See *Gross v. Town of Cicero, Ill.*, 619 F.3d 697,

702-03 (7th Cir. 2010) (collecting cases).  Therefore, as in *Gross*,
this Court "strikes any of the parties' factual assertions, in any
section of their briefs, that lack direct citation to easily
identifiable support in the record."

   *Plaintiffs' Cross Motion for Partial Summary Judgment*

   The Smiths filed their cross motion for summary judgment on
May 12, 2014.  In it, they ask this Court to grant summary judgment
in their favor and declare that William Smith is an individual with
a handicap or disability.  The HASB opposes the motion on both
procedural and substantive grounds.  Procedurally, the HASB points
out that it is untimely.  The dispositive motion deadline was
originally set by this Court for November 25, 2013.  That deadline
was later extended to December 20, 2013.  The HASB filed its
summary judgment motion by that date; however, the Smiths did not
file their cross motion for summary judgment until almost five
months after the deadline.  The Smiths urge this Court to allow the
cross motion because it was filed prior to their (timely filed
because of the Court's extensions) Response Brief.  The HASB and
the Smiths each cite to district court cases in support of their
position.  See e.g., *Winters v. UNUM Life Ins. Co. of Am.*, 232
F.Supp.2d 918, 921 (W.D. Wis. 2002) (denying untimely cross-
motion); *Rivkin v. Diversified Realty Grp. Partners*, No. 86 CIV.
9048, 1989 WL 79378, *5 (S.D.N.Y. July 11, 1989) (allowing untimely

cross motion). What is true of both lines of cases is that this is a matter left to the sound discretion of the trial court. Therefore, this Court, in its discretion, **DENIES** the Smiths' cross motion for partial summary judgment as untimely. However, the Court declines to strike the motion in its entirety and will instead consider the Smiths' properly cited and supported evidence and any relevant and fully-developed arguments in their cross motion and reply brief when considering the disability determination issue raised in the HASB's motion for summary judgment.

*Material Facts*[8]

<u>Eviction of William Smith & Disability</u>

William Smith moved into apartment 416 of the HASB's high-rise building located at 628 Western Avenue, South Bend, Indiana on November 15, 2004. (W. Smith Dep. pp. 96-97, DE #92-2, pp. 11-12; Lottie Aff. ¶ 8, DE #92-1, p. 2.) Subsequently, he was issued

---

[8] The Court notes that it has borrowed liberally from the HASB's Statement of Uncontested Material Facts section, as the Smith's ignore most of the evidence provided by the HASB. Thus, where the HASB has appropriately cited to the record, and where that evidence remains uncontested by the Smiths, it is deemed admitted. The Court has acknowledged where the facts are disputed by the Smiths, but only to the extent that those facts are material, are accurately cited to in the record, have not mischaracterized evidence, and have not been previously stricken by the Court as set forth above. See *Roger Whitmore's Auto. Serv., Inc. v. Lake County, Ill.*, 424 F.3d 659, 664, n. 2 (7th Cir. 2005) ("It is not the duty of the district court to scour the record in search of material factual disputes.").

several lease termination notices for violating his lease by disturbing the peaceful enjoyment of other tenants and engaging in disorderly conduct. (Lottie Aff. ¶ 9, DE #92-1, p. 2; Mammolenti Aff. ¶ 9, DE #92-3, p. 2.) The third such notice ultimately resulted in William Smith's eviction, after Lubirta Smith (William Smith's girlfriend at the time) reported to the police that he had pulled her coat over her face and hit her on May 4, 2008. (Notice, DE #92-5; Police Report, DE #92-6.) Based on those incidents, the HASB filed an immediate possession action against William Smith on June 23, 2008. (Notice, DE #92-5; Lottie Aff. ¶ 10, DE #92-1, pp. 2-3.) The HASB consistently issues lease termination notices and pursues immediate possession actions against tenants who disturb the peaceful enjoyment of other tenants and engage in disorderly conduct multiple times. (Lottie Aff. ¶ 11, DE #92-1, p.3.)[9]

The St. Joseph Superior Court, Small Claims Division, granted the HASB immediate possession at a July 7, 2008, hearing. (W. Smith Dep., p. 35, DE #92-2, p. 35; Lottie Aff. ¶¶ 10, 12, 13, DE

---

[9] William Smith testified that believes he was evicted because he made complaints about his upstairs neighbor, Vaughn Steward, related to Mr. Steward's music being too loud and other alleged misconduct. (W. Smith Dep. pp. 61-63 & 325-26, DE #92-2, pp. 5-7 & 63-64.) He claims that Mr. Steward was treated more favorably by the HASB because Mr. Steward was not similarly disciplined or evicted. (W. Smith Dep. pp. 286-87, DE #92-2, pp. 59-60.) In fact, the HASB did issue Mr. Steward a Notice of Good Cause to Terminate Lease on November 13, 2006, for playing his guitar too loudly. (Mammolenti Aff. ¶ 17; DE #92-3, pp. 3-4.) However, the HASB was unaware of any other lease violations by Mr. Steward, and no other violations were noted in his file. (*Id*.) Mr. Steward ultimately voluntarily moved out of public housing on October 2, 2008, a few months after William Smith's eviction. (*Id*. at ¶ 18, DE #92-3, p. 4.)

#92-1, pp. 2-3.) Cornelius Lottie, the HASB's Assistant Manager of Public Housing, appeared for the HASB at the immediate possession hearing. (Lottie Aff. ¶¶ 2, 12, DE #92-1, pp. 1, 3; L. Smith Dep. p. 325, DE #92-7, p. 103.) William Smith did not appear at the hearing because he was in the hospital for an emergency bowel obstruction; instead, Lubirta Smith (then William Smith's girlfriend) appeared on his behalf. (W. Smith Dep. pp. 223, 225-26, DE # 92-2, pp. 48-50; L. Smith Dep. p. 233, DE #92-7, p. 51; Lottie Aff. ¶ 13, DE # 92-1, p. 3.) Lubirta Smith informed the court about William Smith's medical condition and hospitalization at the immediate possession hearing. (L. Smith's Dep. pp. 231-33, DE #92-7, pp. 49-51.) The HASB had no knowledge of William Smith's hospitalization or his medical condition before the immediate possession hearing. (Lottie Aff. ¶ 12, DE #92-1, p. 3; W. Smith Dep. pp. 231-32, DE #114-1, p. 12 & DE #92-2, p. 53; L. Smith Dep. p. 234, DE #92-7, p. 52; Fleckner Aff. ¶ 6, DE #92-8, p. 2; Mammolenti Aff. ¶ 10, DE #92-3, p. 2; Brownlee Aff. ¶ 14, DE #92-9, p. 3.) The Smiths have not presented any admissible evidence to the contrary.

William Smith was hospitalized for nineteen days due to his bowel obstruction surgery. (W. Smith Dep. p. 291, DE #106, p. 2.) When he got out of the hospital he was "pretty weak." (*Id*. at 292, DE #106, p. 3.) He suffered from anxiety at that time, and the surgery affected his strength "for a while." (*Id*.) The surgery

also affected his ability to walk long distances "for a while."
(*Id.*)  He had to use a walker device while he was in the hospital
and when he was recovering at home for support and stability.  (*Id.*
at 292-93, DE #106, pp. 3-4.)  Lubirta Smith took care of him while
he was recovering at cooked his meals and did the laundry.  (*Id.* at
294, DE #106, p. 5.)

However, William Smith made a full recovery from his bowel
obstruction surgery.  (*Id.* at 229, DE #92-2, p. 52.)  After about
one month, William Smith returned to his normal routine and
continued living the same way he had lived before the surgery.
(*Id.*)  After being out of the hospital for about a month, William
Smith required no assistance in caring for himself, he regained his
strength, and he no longer used a walker and could walk long
distances.  (*Id.* at 328, DE #92-2, p. 65.)  When asked about a
health condition or anything related to his health, he testified as
follows: "I don't have no -- what kind of health condition?  A
normal illness, what normal people my age would have.  I don't have
no health conditions, really."  (*Id.* at 137, DE #92-2. P. 17.)
When asked whether he believed whether anyone at the HASB
discriminated against him because of a disability or any kind of
health condition, he replied, "no."  (*Id.* at 138, DE #92-2, p. 18.)
When asked whether he ever felt like anyone at the HASB treated him
unfairly or differently because of any kind of health condition, he
again replied, "no."  (*Id.*)

On July 23, 2008, shortly after William Smith was evicted, he married Lubirta Smith and moved in with her. (L. Smith Dep. pp. 237, 323, DE #92-7, pp. 55, 65.) Lubirta Smith lived in the same public housing building as William Smith, and her apartment, unit 403, was just down the hall from William Smith's former unit. (Mammolenti Aff. ¶ 11, DE #92-3, p. 3.)

### Section 8 Voucher Program

Lubirta Smith applied, on behalf of herself and William Smith, for the Housing Choice Voucher Program ("Section 8 Program") which is administered by the HASB. (Brownlee Aff. ¶ 8, DE #92-9, p. 2.) On May 28, 2009, the HASB initially denied the Section 8 Program application because the HASB's security background check of the Smiths showed criminal activity on April 28, 2008. (L. Smith Dep. p. 227, DE #92-7, p. 47; Brownlee Aff. ¶¶ 9, 15, DE #92-9, pp. 2-3.) The HASB's policy prohibits Section 8 Program assistance to applicants when the applicant or any member of the applicant's household is currently engaged in, or has engaged in within the last three years, certain criminal activities, including drug-related criminal activity or criminal activity that threatens the health, safety or right to peaceful enjoyment of other residents or persons in the immediate vicinity. (Brownlee Aff. ¶ 10, DE #92-9, p 2.) After receiving the May 28, 2009, notice denying Section 8 Program assistance, however, the Smiths both

produced records from St. Joseph County Police showing they had no arrest records in the past three years. (L. Smith Dep. pp. 227, 454, DE #92-7, pp. 47, 77; W. Smith Dep. pp. 245-46, DE #92-2, pp. 56-57.)

On June 8, 2009, eleven days after the initial denial notice, and less than a week after the HASB received the Smiths' arrest record history, the HASB approved the Section 8 Program application. (L. Smith Dep. pp. 227-228, DE #92-7, pp. 47-48; Brownlee Aff. ¶¶ 13, 16, DE #92-9, p. 3.) The Smiths moved directly from 628 Western into Section 8 housing at 614 South Summit Drive on approximately August 31, 2009. (Mammolenti Aff. ¶ 13, DE #92-3, p. 3; L. Smith Dep. pp. 59-60, DE #92-7, pp. 4-5.)

Lubirta Smith testified that HASB "tried to stop [her] from getting [her] Section 8" in retaliation for her complaints of associational discrimination and/or her association with Mr. Smith. (L. Smith Dep. pp. 244, 273-75, DE #92-7, pp. 56, 61-63.) Lubirta Smith initially testified she complained about being treated unfairly because of William Smith's health condition to Linda Brownlee, HASB's Assistant Manager of Section 8 (L. Smith Dep. pp. 269-72, DE #92-7, pp. 57-60), but later Lubirta Smith testified that she never mentioned William Smith's health to Linda Brownlee. (L. Smith Dep. pp. 477, 482-83, DE #92-7, pp. 78-80; Brownlee Aff. ¶¶ 14, 17, DE #92-9, p. 3.). In any event, there is no evidence in the record that Lubirta Smith made *any* complaints related to

William Smith's alleged disability prior to July of 2009, which was after William Smith's eviction, after the temporary denial of Section 8 Program benefits, and after the HASB granted her Section 8 Program benefits. (L. Smith Dep. pp. 273-74, DE #92-7, pp. 61-62; Lottie Aff. ¶¶ 9, 12, 13, DE #92-1, p. 2-3; Brownlee Aff. ¶¶ 9, 13, 15-16, DE #92-9, pp. 2-3.)

Habitability

At all relevant times during the Smiths' tenancy, the HASB had a maintenance complaint process to accept and promptly remedy tenant maintenance concerns. (Fleckner Aff. ¶ 8, DE #92-8, p. 2.) Specifically, the HASB instructs tenants to report maintenance concerns by calling the maintenance department hotline. (Id.) In response to such complaints, the HASB's maintenance department generates a work order and assigns a maintenance technician to promptly remedy the problem. (Id.) Although the maintenance department's response time varies depending on the severity of the issue, the HASB typically addresses non-emergency repair requests within one week. (Fleckner Aff. ¶ 9, DE #92-8, p. 2; W. Smith Dep. p. 141, DE #92-2, p. 20.) The Smiths knew about and used this complaint process. (L. Smith Dep. pp. 100-01, DE #92-7, pp. 14-15; W. Smith Dep. pp. 140-41, DE #92-2, pp. 19-20.)

In addition to addressing tenant maintenance concerns through this complaint process, the HASB public housing properties are

thoroughly inspected at least twice each year. (Fleckner Aff. ¶¶ 10-11, DE #92-8, pp. 2-3.) The HASB contracts with a third-party inspection company to inspect each public housing unit every year. (Fleckner Aff. ¶ 10, DE #92-8, pp. 2-3.) The Department of Housing and Urban Development ("HUD") also inspects the HASB public housing buildings either annually or every other year depending on the prior physical inspection score. (Fleckner Aff. ¶ 11, DE #92-8, p. 3.) HUD inspected the Smiths' building, 628 Western, in 2000, 2002, 2004, 2006, 2007, and 2009. (*Id.*) The building passed each HUD inspection. (*Id.*)

The Smiths have presented the following evidence related to the condition of their apartments:

### 1. William Smith's Toilet

William Smith testified that the chain in the toilet tank broke. (W. Smith Dep. p. 145-46, DE #92-2, pp. 21-22.) However, he stated that the maintenance department replaced the broken chain when he reported the problem to the HASB. (W. Smith Dep. p. 149, DE #92-2, p.) Second, the toilet broke again and caused a flood a day or two after William Smith reported the problem to the HASB's maintenance department. (W. Smith Dep. pp. 147-48, 150, DE #92-2, pp. 23-24, 26.) Maintenance stopped the flooding and replaced the toilet the same day the flood occurred. (W. Smith Dep. pp. 151-52, DE #92-2, pp. 27-28.) Mr. Smith did not experience any other

problems with his toilet after HASB replaced it. (W. Smith Dep. p. 152, DE #92-2, p. 28.)

### 2. Pests

William Smith testified that his apartment and hallway were infested with roaches, and he had mice in his unit. (W. Smith Dep. pp. 159, 172, DE #92-2, pp. 29-30, 35; see also W. Smith Dep. pp. 159, 161-63, 299, DE #110-4, p. 41-44, 85.) Lubirta Smith testified she had some roaches in her apartment, but she claims her "biggest problem" was mice and bed bugs. (L. Smith Dep. p. 348, DE #92-7, p. 67.) Throughout the Smiths' tenancy, the HASB contracted with a pest control provider to ensure industry-leading treatment of roaches, bedbugs, mice and other pests. (Fleckner Aff. ¶¶ 14, 15, DE #92-8, pp. 3-4) Until a few months before the Smiths moved out of 628 Western in August 2009, pest control treatment was tenant-driven, meaning the HASB dispatched its contractors to treat units and buildings in response to tenant complaints about pests. (Fleckner Aff. ¶ 16, DE #92-8, p. 4.) The HASB informed Plaintiffs of this complaint process. (Fleckner Aff. ¶ 14, DE #92-8, p. 3.) The Smiths complained to HASB about pests, and their units were treated in response to their complaints. (L. Smith Dep. pp. 98, 106-07, DE #92-7, pp. 13, 18-19 ; W. Smith Dep. pp. 164-65, DE #92-2, pp. 30-31.) The HASB pest control contractors prepared and maintained records memorializing the pest control treatment

provided in response to each tenant pest complaint, including all of the Smiths' complaints. (Fleckner Aff. ¶¶ 17-20, DE #92-8, p. 4; Pest Control Records, DE #92-10.)

Pest control records from the Smiths' units show neither unit had a significant or frequent pest problem and establish that the HASB took action to exterminate the pests when the Smiths complained. (Pest Control Records, DE #92-10; Fleckner Aff. ¶¶ 20-21, DE #92-8, pp. 4-5.) According to the pest control records, William Smith only complained about pests five times during his three and a half year residency in apartment 416. (Pest Control Records, DE #92-10; Fleckner Aff. ¶ 20, DE #92-8, p. 4.) Specifically, the HASB pest control contractors inspected and treated William Smith's unit on December 8, 2004, February 8, 2005, February 15, 2006, May 24, 2006, and July 19, 2007. (*Id.*) The contractors found no roaches in William Smith's unit on May 24, 2006, or July 19, 2007. (*Id.*) Similarly, according to the pest control records, Lubirta Smith only complained four times about pests. (Pest Control Records, DE #92-10; Fleckner Aff. ¶ 21, DE #92-8, p. 4.) Specifically, contractor for the HASB inspected and treated her unit for pests in 2004, 2006, 2007, and 2008. (*Id.*) The contractor found "few roaches" in 2004, 2006, and 2007, and the contractor found no roaches in 2008. (*Id.*) Nevertheless, during each of those visits, the contractor "baited" the unit. (*Id.*) On February 11, 2009, a contractor for the HASB inspected Lubirta

Smith's unit and found insect infestation in her unit. (February 11, 2009 Inspection Report, DE #92-11; Fleckner Aff. ¶ 22, DE #92-8, p. 5.) The HASB's contractor treated her unit the following day. (Pest Control Records, DE #92-10; Fleckner Aff. ¶ 22, DE #92-8, p. 5.) The HASB contractor inspected and treated Lubirta Smith's unit for pests (roaches and bed bugs) again on June 11, 2009 and June 18, 2009. (*Id.*) The contractor found few or no roaches during these June 2009 inspections, but found bedbugs for the first time in Mrs. Smith's unit. (*Id.*) The HASB was not aware any 628 Western tenant had bedbug problems until 2009. (Fleckner Aff. ¶ 23, DE #92-8, p. 5.) Upon learning of the bedbug concern, the HASB's Manager of Maintenance, David Fleckner, researched the proper treatment of bedbugs in a multi-family residence like 628 Western and worked with the HASB's pest control contractor for proper extermination. (Fleckner Aff. ¶¶ 3, 23, DE #92-8, pp. 1, 5.) The treatment was later reviewed and approved by the Indiana Department of Health. (Fleckner Aff. ¶ 23, DE #92-8, p. 5.) Lubirta Smith's apartment was treated once more for bedbugs and roaches on August 6, 2009, and for roaches on August 13, 2009. (Pest Control Records, DE #92-10; Fleckner Aff. ¶ 23, DE #92-8, p. 5.)

With regard to mice, Lubirta Smith testified that she contacted HUD about this problem and a HUD employee and Mr. Lottie, Assistant Manager of Public Housing, responded by inspecting her

unit.  (L. Smith Dep. pp. 102-03, DE #92-7, pp. 16-17.)  After this
inspection, Lubirta Smith acknowledges the HASB treated her unit
"almost right away," and she no longer saw mice.  (L. Smith Dep.
pp. 106-07, DE #92-7, pp. 18-19.)


### 3. *William Smith's Air Conditioner*

William Smith testified that his air conditioner did not work
because of a faulty filter.  (W. Smith Dep. pp. 172-73, DE #92-2,
pp. 35-36.)  But, during his deposition, William Smith admitted
that the HASB's maintenance department changed his air
conditioner's filter and fixed his air conditioner within a day or
two after he called the HASB to report the problem.  (W. Smith Dep.
pp. 173-74, 177, DE #92-2, pp. 36-38.)


### 4. *Elevators in 628 Western*

As to the 628 Western elevators, William Smith testified that
the cameras didn't work in the elevator.  (W. Smith Dep. pp. 301,
DE #114-1, p. 17.)  The Smiths both testified that they could only
recall one time when both elevators were broken at the same time,
and that was for about a two day period.  (W. Smith Dep. pp. 180-
81, DE #92-2, pp. 39-40; L. Smith Dep. p. 145, DE #92-7, p. 21.)
Neither of the Smiths complained to the HASB about the elevators
being broken.  (W. Smith Dep. p. 182, DE #92-2, p. 41; L. Smith
Dep. p. 144, DE #92-7, p. 20.)  The HASB has a full-service

contract with Schindler Elevator Corporation to repair and maintain 628 Western's two elevators. (Fleckner Aff. ¶ 26, DE #92-8, p. 6; Cunningham Aff. ¶¶ 3, 4, DE #92-12, p. 1; Schindler Elevator Records, DE #92-13.) The HASB contacts Schindler whenever it receives notice of elevator malfunction at 628 Western, and Schindler dispatches a field technician to fix the problem. (Fleckner Aff. ¶ 27, DE #92-8, p. 6; Cunninham Aff. ¶ 6, DE #92-12, p. 1). Schindler usually fixes any elevator malfunctions within a couple of hours of getting a call from the HASB. (Fleckner Aff. ¶ 27, DE #92-8, p. 6.) According to the elevator records, the elevators at 628 Western were never both unusable for a full day. (Schindler Elevator Records, DE #92-13; Fleckner Aff. ¶ 27, DE #92-8, p. 6.)

### 5. *Lubirta Smith's Carpet*

The HASB installed new carpet in Lubirta Smith's unit before she moved in. (L. Smith Dep. pp. 77-79, DE #92-7, pp. 8-10.) On August 10, 2008, Lubirta Smith's carpet got wet after a sprinkler head broke in her neighbor's unit. (L. Smith Dep. p. 161, DE #92-7, p. 24; Fleckner Aff. ¶ 30, DE #92-8, p. 6.) A HASB contractor attempted to remove the water from the carpet to preserve it, but ultimately decided to install new carpeting. (Fleckner Aff. ¶ 30, DE #92-8, p. 6.) The new carpeting was installed in Lubirta Smith's unit on August 21, 2008, eleven days after the flood. (L.

Smith Dep. pp. 158-59, 166, DE #92-7, pp. 22-23, 25; Fleckner Aff. ¶ 30, DE #92-8, p. 6; August 21, 2008 Work Order, DE #92-14.) Lubirta Smith had no further concerns after the carpet was replaced. (L. Smith Dep. p. 174, DE #92-7, p. 29.)

### 6. Lubirta Smith's Possible Mold Concerns

Lubirta Smith testified that she noticed a small area of mold in her bathroom between the tiles. (L. Smith Dep. pp. 175-77, DE #92-7, pp. 30-31.) She reported these concerns to her Housing Specialist, Kathy Mammolenti. (L. Smith Dep. pp. 170-71, DE #92-7, pp. 26-27.) Mammolenti and another employee from the HASB inspected her apartment but found no mold. (L. Smith Dep pp. 170-71, 175-76, DE #92-7, pp. 26-27, 30-31.) Lubirta Smith testified that she was able to clean the suspected "mold" spot on her bathroom tile, and the new carpeting, which was installed eleven days after the flood as noted above, remedied any remaining concerns she had about mold from the flood. (L. Smith Dep. pp. 174, 176, DE #92-7, pp. 29, 31.) Lubirta Smith also testified that she was concerned about a black spot on the pipe underneath her kitchen sink. (L. Smith Dep. 177-78, DE #92-7, pp. 32-33.) Lubirta Smith admitted that the HASB replaced the problem pipe after she complained about the issue, and she had no further problems with possible mold on it. (L. Smith Dep pp. 178-79, DE #92-7, pp. 33-34.)

*7. Stoppage in Building Disposal Systems*

Lubirta Smith testified that the odor from a stoppage in the building's disposal systems made her home uninhabitable. (L. Smith Dep. pp. 193-95, DE #92-7, pp. 38-40.) Lubirta Smith never reported this problem to the HASB. (L. Smith Dep. p. 195, DE #92-7, p. 40.) She testified that she successfully blocked the smell from entering her unit with a door stopper, and the HASB remedied the problem by welding the trash chute shut. (L. Smith Dep. pp. 360-61, DE #92-7, pp. 68-69.)

*8. Removal of Dead Body*

The HASB states that it has no knowledge of a dead body causing a smell in the building, and Lubirta Smith testified that "no one knew" the man died. (L. Smith Dep. pp. 187-89, DE #92-7, pp. 35-37; Mammolenti Aff. ¶ 21, DE #92-3, p. 4.) Lubirta Smith testified that once the issue came to light, someone in white plastic clothes and masks removed the body, and the smell went away. (L. Smith Dep. pp. 187-89, DE #92-7, pp. 35-37.)

*9. Cleanliness of Common Areas*

William Smith testified that the HASB "tried to keep [the common areas] clean;" he seldom saw them dirty; and he did not complain to HASB about common area uncleanliness. (W. Smith Dep.

pp. 201-02, 328-30, DE #92-2, pp. 43-44.)

ANALYSIS

*FHA, Rehab Act, and ADA Claims*

For part of their First Claim and for their Second and Third Claims, the Smiths allege that the HASB has violated the FHA, the Rehab Act, and the ADA in that they have discriminated against William Smith on the basis his disability and against Lubirta Smith because of her association with William Smith.

The FHA, Rehab Act, and ADA all serve to protect disabled individuals from discrimination by a public entity. See 42 U.S.C. § 3604(f); 42 U.S.C. § 12132; 29 U.S.C. § 794(a). The three statutes are "separate but interrelated federal laws that protect persons with disabilities from discrimination." *Wisconsin Cmty. Serv., Inc. v. City of Milwaukee*, 465 F.3d 737, 746 (7th Cir. 2006). All three claims may properly be analyzed together because, "[f]or the purpose of this case, the standards for these claims under the three statutes are essentially the same." *A.B. ex rel. Kehoe v. Hous. Auth. of South Bend*, No. 3:11-CV-163, 2012 WL 1877740, *4 (N.D. Ind. May 18, 2012) (citing *Jackson v. City of Chicago*, 414 F.3d 806, 810-11 (7th Cir. 2005); *Oconomowoc Residential Programs v. City of Milwaukee*, 300 F.3d 775, 782 (7th Cir. 2002); *Dadian v. Vill. of Wilmette*, 269 F.3d 831, 837 (7th Cir. 2001)); see also *CTL ex rel. Trebatoski v. Ashland Sch. Dist.*,

743 F.3d 524, 528 (7th Cir. 2014) (Rehab Act and ADA are "coextensive").

As a "threshold requirement" for disability discrimination claims, a plaintiff must establish that he is disabled as defined under those statutes and relevant regulations. *Id.*; see also *Steffen v. Donahoe*, 680 F.3d 738, 743 (7th Cir. 2012) (analyzing claims brought pursuant to both the ADA and Rehab Act under the ADA's definition of disability; *Oconomowoc*, 300 F.3d at 782 ("The definition of a disability under the ADA is substantively identical to that in the FHAA.").[10]

Enacted in 1990, the ADA originally defined disability as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2) (current version at 42 U.S.C. § 12102(1)). Because the 1990 statute failed to define the terms 'substantially limits' and 'regarded as,' the precise meaning of each phrase was left to judicial interpretation. See, e.g., *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 198 (2002) (holding that a disability 'substantially limits' a major life activity where it

---

[10]  This is true for "associational disability discrimination" claims as well, because a plaintiff must prevent evidence that the disability of the person they associated with was a "determining factor" in the actions of the defendant; in other words, the plaintiff must show that the reason the defendant took those actions was because of discriminatory intent.  See *Magnus v. St. Mark United Methodist Church*, 688 F.3d 331, 337-38 (7th Cir. 2012) (citing *Stockwell v. City of Harvey*, 597 F.3d 895, 901-02 (7th Cir. 2010)).

"prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives" and has an impact that is "permanent or long term"); *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489 (1999) (holding that in order to be 'regarded as' having a disability, an employer must "believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting.").

In September 2008, President Bush signed the ADA Amendments Act of 2008 ("ADAAA") that went into effect on January 1, 2009. Pub. L. No. 110-325, 122 Stat. 3553 (codified as amended at 42 U.S.C. § 12101 et seq.). Although the ADAAA left unchanged the definition of 'disability' found in the original version of the ADA, the amendments conveyed Congress' intent to reject both *Toyota's* interpretation of 'substantially limits,' and *Sutton's* reasoning concerning the 'regarded as' prong of the definition of a 'disability.' *Id*. at sec. 2(b)(3)-(4). In doing so, Congress expanded the reach of the ADA. However, the Seventh Circuit has since clarified that the ADAAA does not apply retroactively, so courts must "look to the law in place prior to the amendments." *Steffen*, 680 F.3d at 744 (quoting *Fredricksen v. United Parcel Serv., Co.*, 581 F.3d 516, 521 n. 1 (7th Cir. 2009)). Thus, when the events giving rise to disability discrimination occurred prior to the effective date of the ADAAA, courts in the Seventh Circuit

-31-

must use *Toyota*, *Sutton*, and their progeny to analyze those claims.

The Seventh Circuit has reiterated that a medical condition and/or diagnosis standing alone, even if severe, is not determinative on the issue of establishing disability. *Fredricksen*, 581 F.3d at 521 (citing *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 566–67 (1999) (determination of disability is based not on diagnosis of impairment but on effect of impairment)). To qualify as disabling, an individual's medical condition must substantially limit a major life activity. *Squibb v. Mem'l Med. Ctr.*, 497 F.3d 775, 781 (7th Cir. 2007). It must also be permanent or long term. *Vande Zande v. State of Wis. Dept. of Admin.*, 44 F.3d 538, 544 (7th Cir. 1995) (noting that "[i]ntermittent, episodic impairments are not disabilities, the standard example being a broken leg."); *Ogborn v. United Food and Commercial Workers Union, Local No. 881*, 305 F.3d 763, 767 (7th Cir. 2002) (citing Vande and noting that "intermittent, episodic impairments such as broken limbs and appendicitis are not disabilities"). For example, "a limitation on the ability to walk must be 'permanent or long term, and considerable compared to the walking most people do in their daily lives.'" *Fredricksen*, 581 F.3d at 521 (citing *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 802 (7th Cir. 2005)).

Here, the HASB argues that the Smiths' FHA, Rehab Act, and ADA claims fail because the record shows that William Smith is not

"disabled" as defined under those statutes.  It is undisputed that
William Smith underwent bowel obstruction surgery in 2008, for
which he was hospitalized for nineteen days.  It is also undisputed
that, for one month after that hospitalization, he was weak, had
trouble walking, had to use a walker for support and stability, and
relied on Lubirta Smith to help him and take care of some of his
basic needs such as cooking and laundry.  However, as the HASB
points out, the undisputed evidence provided via William Smith's
testimony establishes that within a month of his bowel obstruction
surgery he was back to his normal routine, no longer used a walker,
could walk long distances, had regained his strength, and was able
to care for himself.  Nothing in the Smiths' Response Brief (or
cross motion for summary judgment) creates a genuine dispute as to
these facts.[11]

Under relevant Seventh Circuit case law, while William Smith's
bowel obstruction surgery was likely a serious medical
issue/condition, it was not a "disability" per se.  Rather, to
establish that William Smith is disabled as their attorney asserts,

---

[11]  In their Appendix under the heading "Disability," the Smiths state
that William Smith "observed the treatment by [the] HASB staff members of a
male resident known as "Cadillac" who was blind and appeared to be an
individual with intellectual disabilities. . . . This treatment included
allowing "Cadillac" to live in an apartment in which electrical outlets were
exposed without safety coverings necessary to prevent injury."  (DE #110-1, p.
10.)  But the testimony at the page they cite to only mentions that "Cadillac"
was blind, and William Smith testified that he didn't go into "Cadillac's"
apartment," (See W. Smith Dep. p. 302, DE #114-1, p. 18.)  In any event, the
Court is not sure why this is relevant to establishing that William Smith was
disabled or that he was subject to any intentional discrimination because of
his observations of "Cadillac," and the Smiths' brief sheds no light on the
issue.

evidence must be presented such that he was substantially limited in a major life activity. While the Smiths point to evidence that he had trouble walking and had to use a walker for stability purposes, the HASB correctly responds that this does not create a genuine dispute because the undisputed evidence provides that the limitation was neither permanent nor long term. See *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 802 (7th Cir. 2005). The Smiths' vague references to William Smith's short-term dependency on Lubirta Smith for cooking and laundry similarly do not create a genuine dispute. See *Fredricksen*, 581 F.3d at 522-23 ("Vague assertions of difficulty performing a major life activity do not create a genuine issue of material fact, particularly when unaccompanied by any evidence that the limitation is substantial compared to that of other adults.") The failure of the Smiths to provide evidence that William Smith was disabled or was regarded as such by the HASB is sufficient to warrant the grant of summary judgment on the Smiths' FHA, Rehab Act, and ADA disability discrimination claims.

The Smiths specifically state that the "HASB's contention [that William Smith is not disabled], if correct, would preclude both [William] Smith's claims under the Fair Housing Act Amendments, 42 U.S.C. § 3601 and the Rehabilitation Act, 29 U.S.C. § 794 and [Lubirta] Smith's claims based on associational standing." (DE #107, p. 5.) Therefore, any undeveloped arguments

to the contrary are deemed waived.  The Court notes, however, that as to William Smith's disability discrimination claims, the HASB points to undisputed evidence in the record that William Smith admitted that no one at the HASB treated him unfairly or differently because of any kind of health condition that he may have had, that no one at the HASB knew of his bowel obstruction surgery until after it had issued his lease termination notice, and that they evicted him for legitimate non-discriminatory reasons (i.e. repeated noise violations and disorderly conduct).  As to Lubirta Smith's associational disability discrimination claims, the HASB points to undisputed evidence that her Section 8 application was granted a little over a week after it was initially denied (so she was not subject to any adverse action) and that there is no evidence that William Smith's alleged disability was a determining factor in any of HASB's actions against her.  Specifically, the HASB points out any alleged complaint she made to HASB about William Smith's alleged disability was made after his eviction and after Lubirta Smith was declared temporarily ineligible for the Section 8 Program.  Because the Smiths make absolutely no effort to set forth a *prima facie* case of disability discrimination for either William or Lubirta Smith, the Court will not engage in that effort for them and finds simply that summary judgment is warranted on those grounds as well.

Finally, as to the Smiths' retaliation claims, the HASB is

correct in noting that the Smiths have failed to present any admissible evidence that William Smith engaged in a statutorily protected activity. Similarly, any alleged complaint by Lubirta Smith to the HASB regarding William Smith's disability was done after William Smith's eviction and after her Section 8 Program benefits were initially denied. The Smiths have not presented evidence to the contrary.[12] These failures doom the Smiths' retaliation claims at the summary judgment stage. See e.g. *Cloe v. City of Indianapolis*, 712 F.3d 1171, 1180 (7th Cir. 2013). As noted above, the Smiths do not attempt to establish a *prima facie* case of retaliation and do not provide any argument or analysis (or cite to any applicable case law) in support of these claims. The Court will not attempt to make their case for them. See *Matthews v. Waukesha Cnty.*, 759 F.3d 821, 826 (7th Cir. 2014) (citing *Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011) ("Neither the district court nor this court are obliged to research and construct legal arguments for parties, especially when they are represented by counsel."))

---

[12] William Smith's complaints about Mr. Steward's alleged noise and misconduct do not relate to disability discrimination in any way. Similarly, much of the testimony of William Smith referenced in the "Retaliation" section of the Smiths' Appendix is either not included in the record or mischaracterizes the evidence, and none of it establishes that he engaged in any sort of protected activity related to his disability or the rights afforded to him because of it.

*Habitability & Third Party Beneficiary Claim*

In their Amended Complaint, the Smiths allege that the HASB failed to provide them with habitable premises and "breached contracts of which [the Smiths] are intended third-party beneficiaries." They assert that these violations are based on both Indiana law and on federal law. Under Indiana law, a landlord must:

(1) Deliver the rental premises to a tenant in compliance with the rental agreement, and in a safe, clean, and habitable condition.

(2) Comply with all health and housing codes applicable to the rental premises.

(3) Make all reasonable efforts to keep common areas of a rental premises in a clean and proper condition.

(4) Provide and maintain the following items in a rental premises in good and safe working condition, if provided on the premises at the time the rental agreement is entered into:

(A) Electrical systems.

(B) Plumbing systems sufficient to accommodate a reasonable supply of hot and cold running water at all times.

(C) Sanitary systems.

(D) Heating, ventilating, and air conditioning systems. A heating system must be sufficient to adequately supply heat at all times.

(E) Elevators, if provided.

(F) Appliances supplied as an inducement to the rental agreement.

Ind. Code § 32-31-8-5.  To succeed on a claim that a landlord violated these obligations, a tenant must establish that: (1) they gave the landlord notice of the alleged noncompliance; (2) they gave the landlord a reasonable amount of time to make repairs or provide a remedy of the condition described; and (3) the landlord ultimately failed or refused to repair or remedy the condition. See Ind. Code § 32-31-8-6.

Federal law requires that a housing authority incorporate similar obligations related to keeping the premises in decent and sanitary condition into all of their landlord/tenant leases. Specifically, 24 C.F.R. section 966.4(e) requires a housing authority:

> (1) To maintain the dwelling unit and the project in decent, safe, and sanitary condition;
>
> (2) To comply with requirements of applicable building codes, housing codes, and HUD regulations materially affecting health and safety;
>
> (3) To make necessary repairs to the dwelling unit;
>
> (4) To keep project buildings, facilities, and common areas, not otherwise assigned to the tenant for maintenance and upkeep, in a clean and safe condition;
>
> (5) To maintain in good and safe working order and condition electrical, plumbing, sanitary, heating, ventilating, and other facilities and appliances, including

> elevators, supplied or required to be supplied
> by the PHA;
>
> (6) To provide and maintain appropriate
> receptacles and facilities (except containers
> for the exclusive use of an individual tenant
> family) for the deposit of ashes, garbage,
> rubbish, and other waste removed from the
> dwelling unit by the tenant in accordance with
> paragraph (f)(7) of this section;
>
> (7) To supply running water and reasonable
> amounts of hot water and reasonable amounts of
> heat at appropriate times of the year
> (according to local custom and usage), except
> where the building that includes the dwelling
> unit is not required by law to be equipped for
> that purpose, or where heat or hot water is
> generated by an installation within the
> exclusive control of the tenant and
> supplied by a direct utility connection.

24 C.F.R. § 966.4(e).

When a contract is made for a third-party's direct benefit, he may be entitled to rights pursuant to that contract. *Holbrook v. Pitt*, 643 F.2d 1261, 1270 (7th Cir. 1981). "Federal common law applies to . . . third-party beneficiary claims [when] a federal agency is a party to the action and [when] the outcome of [a] case will directly affect substantial financial obligations of the United States. *Id*. at 1271, n. 16; *see also Evergreen Square of Cudahy v. Wisconsin Hous. and Econ. Dev. Auth.*, 776 F.3d 463, 467–68 (7th Cir. 2015). Federal courts, however, are not given free range to fashion federal common law. *Conille v. Sec'y of Hous. and Urban Dev.*, 840 F.2d 105, 109 (1st Cir. 1988). Instead:

> Federal common law, being subject to the
> paramount authority of Congress, is resorted

to only as a necessary expedient when federal courts are compelled to consider federal questions which cannot be answered from federal statutes alone. Moreover, if there is no significant conflict between some federal policy or interest and the use of state law, there is no need for a federal court to embark upon the unfamiliar road of common lawmaking, even in situations where the rights or obligations of the United States under a contract are at stake. Thus, in cases involving contractual obligations of the United States that are not addressed by statute, but resolvable under state law without any conflict with federal policy, state law is said to be incorporated as the federal rule of decision.

*Id*. at 109-10.

Keeping these principles in mind, the Court agrees with the HASB that the Smiths' habitability and third-party beneficiary claims are squarely foreclosed by Seventh Circuit law. In *Alexander v. U.S. Dept. of Hous. and Urban Dev.*, 555 F.2d 166, 171 (7th Cir. 1977), the court noted:

We decline plaintiffs' invitation to follow these state court decisions implying a warranty of habitability in urban residential leases in the private sector. We decline to do so because we are not persuaded that such warranties should be implied in leases of dwelling units constructed and operated as public housing projects. In contrast to housing projects in the private sector, the construction and operation of public housing are projects established to effectuate a stated national policy "to remedy the unsafe and insanitary housing conditions and the acute shortage of decent, safe, and sanitary dwellings for families of low income". 42 U.S.C. s 1401. As such, the implication of a warranty of habitability in leases pertaining

> to public housing units is a warranty that the
> stated objectives of national policy have been
> and are being met. We feel that the
> establishment of any such warranty that
> national policy goals have been attained or
> that those goals are being maintained is best
> left to that branch of government which
> established the objectives.

*Alexander v. U.S. Dept. of Hous. and Urban Dev.*, 555 F.2d 166, 171

(7th Cir. 1977). Later, the court cited with approval to *Alexander*

when dismissing a plaintiff's warranty of habitability claim

against a housing authority that was recognized as a federally

regulated and subsidized entity under HUD. *Gibson v. Gary Hous.*

*Auth.*, 754 F.2d 205, 206 (7th Cir. 1985). The *Gibson* court went a

step further and held that the plaintiff's claims related to a

breach of a duty to repair found in a HUD lease was also not a

viable claim. *Id.* at 206-07. Based on these rulings by the

Seventh Circuit, it is clear that the Smiths' implied warranty of

habitability and third-party beneficiary claims against the HASB

cannot be sustained.

Moreover, even if Seventh Circuit precedent did not preclude

the Smiths' claims, they have not shown that any sort of breach

involving the HASB's implied or contractual obligations occurred.

As noted above, it is appropriate for a federal court to look to

state law when there is no conflict between the state and federal

laws. See *Conille,* 840 F.2d at 110, n. 7 (citing *Textile Workers*

*Union of Am. v. Lincoln Mills of Ala.*, 353 U.S. 448, 457 (1957)

("[W]hen certain issues can be resolved via state law principles,

a federal court can incorporate non-conflicting state laws into the analysis as long as the result does not compromise the purposes of a national program.")  Here, the obligations set forth in the Indiana Code and the federal regulations are roughly the same as related to the Smiths' claims.  Namely, the HASB was responsible for maintaining their housing units in decent, safe, and sanitary condition and to make all necessary repairs.  It is reasonable to infer that, like Indiana's statute, a breach of the federal code would also need to involve a notice requirements, a reasonable time within which to respond, and an ultimate refusal to comply or repair the condition after being so notified.  See e.g. *Holbrook v. Pitt*, 643 F.2d 1261, 1274, n. 25 (7th Cir. 1981) ("It is appropriate for courts to supply contract terms requiring performance within a reasonable time where such terms are necessary to fulfill the purposes of the contract.")

The HASB argues that none of the Smiths' testimony cited in their Appendix creates a genuine dispute that the HASB breached any of its obligations.  The Court agrees.  It remains undisputed that the Smiths only notified the HASB about four concerns: (1) William Smith's toilet, twice; (2) pests in their units; (3) William Smith's air conditioner; and (4) the flood in Lubirta Smith's unit.[13]  It also remains undisputed that each of these concerns was

---

[13]  The Court has carefully reviewed the Smiths' Apendix and counter-designations.  As noted, much of the cited testimony is either not included in the record or mischaracterizes the evidence.  To the extent that the testimony is properly cited and characterized, it does not create a genuine dispute that

addressed by the HASB and adequately addressed and/or repaired by the HASB.  For these reasons, summary judgment is appropriate on the Smiths' habitability and third-party beneficiary claims.

CONCLUSION

For the reasons set forth above, the Defendant's Motion for Summary Judgment (DE #91) is **GRANTED**, the Plaintiff's Cross-Motion for Partial Summary Judgment (DE #105) is **DENIED**, and the Defendant's Motion to Strike (DE #112) is **GRANTED**.  The clerk is **DIRECTED** to close this case.


**DATED: March 31, 2015**                    **/s/ RUDY LOZANO, Judge**
                                             **United States District Court**

---

would stave off summary judgment.